**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kishor JOSHI, Jitendra Panchal, Jagadish Panchal, Defendants–Appellants.**

**No. 88–5730.**

United States Court of Appeals, Eleventh Circuit.

March 22, 1990.

Janice Burton Sharpstein, Richard Sharpstein, Sharpstein & Sharpstein, Coconut Grove, Fla., for Kishor Joshi.

Theodore J. Sakowitz, Federal Public Defender, Richard Kough, Asst. Federal Public Defender, Miami, Fla., for Jitendra and Jagadich Panchal.

Dexter Lehtinen, U.S. Atty., Carol Wilkinson, June C. Seraydar, Linda C. Hertz, Harriett R. Galvin, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before FAY and KRAVITCH, Circuit Judges, and CASTAGNA *, District Judge.

KRAVITCH, Circuit Judge:

Jagadish Panchal, Jitendra Panchal, and Kishor Joshi appeal their convictions on three narcotics counts relating to a conspiracy to import and distribute in excess of 1,000 kilograms of hashish. The Panchals claim that the district court deprived them of the right to an impartial jury by permitting the trial to be bifurcated. Joshi contends that he was deprived of a fair trial due to inadequate translation by his interpreter, the admission of an incriminating statement made by a confederate that Joshi is alleged to have adopted by nodding his head, and the failure of the trial court to provide several jury instructions. We affirm the judgment of the district court.

## FACTS

The Panchals, in March 1986, unknowingly hired two undercover Drug Enforcement Administration (DEA) agents to assist their importation of 5,726 pounds of hashish from Bombay, India. The DEA arranged to have the cargo seized in Newark, New Jersey, on March 12, 1986, by the United States Customs Service without compromising the cover of the agents.

The Panchals and the DEA agents subsequently planned to import a second load of hashish into Miami, Florida. On June 11, 1987, two DEA agents met with Jitendra Panchal and Joshi in the agents' car. Panchal introduced Joshi as his partner in both the Newark and the Miami hashish importation plans. Joshi responded by nodding his head. During this meeting they agreed that Joshi would travel to India to obtain the shipping documents that the agents would need in order to receive the cargo in Miami.

On November 19, 1987, Jitendra Panchal and Joshi were arrested after assisting the agents in unloading and identifying barrels containing 2,540 pounds of hashish. Following their arrest, travel documents were seized indicating that Joshi and Jitendra Panchal had planned their travel from Chicago, the Panchals' residence, to Miami and then to Montreal, Canada where they intended to distribute the hashish. Most of the meetings and conversations relating to these plans were recorded.

The three defendants were tried together after the court considered and later denied their motion for severance. Following the presentation of the government's case, the court acceded to the request of the defendants and bifurcated the remainder of the trial. Joshi did not testify or present any evidence. During Joshi's and the government's closing arguments on the Joshi phase of the trial, the Panchals were excluded from the courtroom. Their attorneys, however, were permitted to remain during the arguments. After the jury returned and found Joshi guilty on all counts, it heard testimony from the Panchals, their sister, and Jagadish Panchal's wife. The

---

* Honorable William J. Castagna, U.S. District Judge for the Middle District of Florida, sitting by designation.

same jury found the Panchals guilty on all counts.

## TRIAL BIFURCATION

█ The Panchals contend that the district court's bifurcation of the trial denied the defendants the right to have an impartial jury as guaranteed by the sixth amendment. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 551, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *United States v. Bolinger,* 837 F.2d 436, 438 (11th Cir.), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988). The Panchals argue that the impartiality of the jury was tainted because it had already decided the guilt of a codefendant for the same conspiracies before hearing testimony from the Panchals and witnesses called on their behalf.

The Panchals rely on this court's decision in *United States v. McIver* for the proposition that "a jury which has convicted two co-defendants cannot impartially evaluate the case of the third co-defendant." 688 F.2d 726, 731 (11th Cir.1982). In *McIver,* as in this case, the trial judge bifurcated the proceedings mid-trial. The jury heard the defense case for two of the defendants and returned a guilty verdict. The same jury then heard the third defendant's case and also found him guilty. This court reversed the conviction of the third defendant "because the jury might consider, even if inadvertently, the guilt of the defendant before it ... heard the defendant's case." *McIver,* 688 F.2d at 729. The court explained:

> [T]he three defendants were all charged with the same crimes. The government's evidence presented during the McIvers' phase of the trial pertained to all three defendants. It is unlikely in such a situation that the jury could convict two of the three defendants without forming an opinion regarding the third defendant. Such a jury cannot be impartial; rather, it is "predisposed to find guilt."

*Id.* (quoting *United States v. Stratton,* 649 F.2d 1066, 1082 (5th Cir. Unit A 1981)).[1]

We do not retreat today from this precedent. Nevertheless, we do not reverse the Panchals' convictions because of a critical distinction between this case and *McIver.* In *McIver,* the court denied the third defendant's request to sever and *initiated* the idea of bifurcating the trial. *McIver,* 688 F.2d at 728. The third defendant's lawyer objected to the procedure and "continued throughout the trial to note his objection to the bifurcation." *Id.* at 728.

In contrast, the request to bifurcate the proceedings in this case was made by the defendants over the objections of the government. At the close of the government's case, counsel for Joshi renewed a motion to sever his case from that of the Panchals. During a colloquy with the trial judge, attorneys for the Panchals expressed concern that their clients might offer perjurious testimony implicating Joshi. After reading a summary of the testimony proffered by the Panchals, Joshi's attorney repeated his request for a severance. The court took the motion under consideration and the following colloquy ensued:

> MR. GALANTER [Joshi's attorney]: Judge, because I have an alternative, if the government would agree. I am prepared to go forward at this time and rest my case based on the evidence that the government has presented. I am putting on no evidence.
>
> THE COURT: And then let the jury decide your case and then let them come back and decide the other case?
>
> MR. GALANTER: Exactly.
>
> THE COURT: *Does anybody object to that procedure?* .... That occurred to me as we were talking, but I didn't know if anybody would want to proceed that way.
>
> MR. GALANTER: Judge, that is my preference, based upon what I have just been shown.

1. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

MR. DURKIN [Jagadish Panchal's attorney]: I would concur in that.

MR. WITLIN [Jitendra Panchal's attorney]: I concur, your Honor.

■ The sixth amendment right to an impartial jury, as with other constitutional rights, can be waived. *See Government of Virgin Islands v. Parrott*, 551 F.2d 553, 554–55 (3rd Cir.1977). This court recently noted in the context of a juror bias claim that "where the defendant or defense counsel knows of juror ... bias before the verdict is returned but fails to share this knowledge with the court until after the verdict is announced, the ... [bias] may not be raised as a ground for a new trial." *Bolinger*, 837 F.2d at 439. It is evident from the colloquy between the trial judge and the Panchals' attorneys that the attorneys consented to the bifurcated procedure.

The more difficult question is whether the defendants themselves must personally have consented to the procedure. In *Poole v. United States*, this court acknowledged that "[i]t is difficult to articulate a bright line distinction between those rights an attorney can waive without the defendant's consent and those the attorney cannot waive." 832 F.2d 561, 564 (11th Cir.1987), *cert. denied* ── U.S. ──, 109 S.Ct. 54, 102 L.Ed.2d 33 (1988). This circuit has differentiated those rights requiring the defendant's personal waiver from those that can be waived by defendant's counsel by focusing on whether the waiver involves a fundamentally important personal right or merely a tactical decision with constitutional implications.

Where an "inherently personal right of fundamental importance is involved," the defendant's consent is required. *Poole*, 832 F.2d at 564. Among those rights that a defendant must personally waive are the right to go to trial or plead guilty, *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969); the right to be tried by a judge or jury, *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942), the right to be represented by counsel, *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); and the right to appeal. *Fay v. Noia*, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963).

In contrast, myriad tactical decisions made by defense attorneys throughout the course of their defense implicitly involve the waiver of constitutional rights but do not necessitate the personal consent of the defendant.[2] *Poole*, 832 F.2d at 564. As the Court noted in *Estelle v. Williams*, "the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney." 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976). "A defendant may not remain silent ... and thereafter claim error." *Id.* at 508, 96 S.Ct. at 1695 (quoting *Hernandez v. Beto*, 443 F.2d 634 (5th Cir.), *cert. denied*, 404 U.S. 897, 92 S.Ct. 201, 30 L.Ed.2d 174 (1971)).[3] Otherwise, a trial judge would not be given the opportunity to remedy a potential error. *Estelle*, 425 U.S. at 508 n. 3, 96 S.Ct. at 1695 n. 3. Thus, when defense counsel "makes tactical decisions ... with constitutional implications," the defen-

---

**2.** The consent of an attorney may not bind a defendant where there is evidence of fraud or gross incompetence by the attorney. *United States v. Stewart*, 700 F.2d 702, 704 (11th Cir. 1983); *Winters v. Cook*, 489 F.2d 174, 178 (5th Cir.1973). Defendants have not raised and we make no decision regarding an ineffective assistance of counsel claim in consenting to the bifurcated procedure.

**3.** This reasoning is consistent with the Supreme Court's admonition against " 'sandbagging' on the part of defense lawyers" who intentionally decline to object to a potentially unconstitutional trial procedure in order to inject reversible error into the proceedings. *See Wainwright v.*

*Sykes*, 433 U.S. 72, 89, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). We by no means infer an intent to "sandbag" the trial court in this case. In fact, the record indicates that defense counsel acted pursuant to high ethical standards in discussing the potential of perjurious testimony with the judge and seeking a way to avoid injuring Joshi with such testimony. Nevertheless, the underlying policy against permitting defense attorneys to create the errors of which they later complain remains the same regardless of whether the attorneys realized and appreciated the constitutional implications of the position they advocated. *See Estelle*, 425 U.S. at 512 n. 9, 96 S.Ct. at 1697 n. 9.

dant's consent is not mandated. *Id.* at 508 n. 3, 96 S.Ct. at 1695 n. 3; *Poole,* 832 F.2d at 564; *Stewart,* 700 F.2d at 704; *see United States v. Spiegel,* 604 F.2d 961, 965 n. 9 (5th Cir.1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980).

This court has permitted defense counsel to make tactical decisions that have the effect of waiving their clients' constitutional rights in a variety of contexts. *See, e.g., Poole,* 832 F.2d at 563–64 (counsel's stipulation that had effect of waiving government's burden of proving an element of the offense did not require personal waiver by defendants); *Peek v. Kemp,* 784 F.2d 1479, 1499–1500 (11th Cir.) (en banc) (Kravitch, J., concurring specially in part and dissenting in part) (counsel explicitly consented to juror substitution), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); *Stewart,* 700 F.2d at 704–05 (defense counsel's consent to thirteen person jury waived any right of appellants to twelve person jury); *Huffman v. Wainwright,* 651 F.2d 347, 349–50 (5th Cir. Unit B 1981) (counsel waived defect in jury venire by failing to make proper constitutional challenge); *Spiegel,* 604 F.2d at 964–65 (defense counsel's consent to eleven person jury waived any right of appellants to twelve person jury*); United States v. Allison,* 481 F.2d 468, 470–71 (5th Cir.1973) (acknowledging trial court error in allowing alternate juror to sit in on jury deliberations, but denying relief because defense counsel consented to procedure).

The decision of a defense attorney not to cross-examine a particular witness, for example, is in essence the waiver of a sixth amendment right. *Poole,* 832 F.2d at 564. Likewise, a defense attorney may stipulate to the replacement of a juror without the consent of the defendant "even though the erroneous replacement of a juror may under certain circumstances deprive a defendant of his valued right to have his trial

completed by a particular tribunal, his sixth amendment right to a fair, impartial and representative jury, and his due process rights...." *Peek,* 784 F.2d at 1483–84; *see Poole,* 832 F.2d at 564. Similarly, this court has held that a strategic choice by counsel to use a jury with a potentially biased juror constitutes a waiver of subsequent impartial jury claims based on the inclusion of the juror. *Bolinger,* 837 F.2d at 439 & n. 3.

Consenting to a request for a bifurcated trial is more akin to a tactical decision with constitutional implications than a decision involving an inherent personal right of fundamental importance. By consenting to the bifurcated procedure, trial counsel may well have gambled that the jury would find Joshi not guilty, thereby creating the possibility that Joshi might subsequently provide favorable testimony during the Panchals' segment of the trial and that the jury might be less inclined to find their clients guilty.[4] Counsel also may have reasoned that even if the jury found Joshi guilty, they could then capitalize on that finding by blaming all of the criminal activity on Joshi. The second scenario is essentially what transpired in this case.

Here, the Panchals' counsel expressly consented to a procedure suggested by the defense to bifurcate the trials. Additionally, while the defendants did not expressly consent to the procedure, they were present in court during the colloquy between the court and counsel, knew the matter was being discussed, and made no objection. *See Peek,* 784 F.2d at 1500 n. 2 (Kravitch, J., concurring specially in part and dissenting in part) (suggesting that defendant's consent may be provided by "implicit acquiescence" to counsel's waiver); *cf. Spiegel,* 604 F.2d at 965–66 (passive acquiescence of defendants to counsel's consent sufficient to waive right to a twelve person jury); *Horne v. United*

---

**4.** In fact, it was the prosecutor's recognition of a similar potential tactical advantage that provided the basis for the government's objection to the bifurcated proceedings. The prosecutor noted her concern to the court, explaining:

Supposing he [Joshi] wishes to take the stand after he had been found guilty with no

more exposure before this jury, with no potential for cross-examination regarding his own culpability and the defendants call him and he decides to lie on their behalf, I think the government has to oppose the severances as well as asking the jury to decide this case separately....

*States,* 264 F.2d 40, 42 (5th Cir.) (same), *cert. denied,* 360 U.S. 934, 79 S.Ct. 1460, 3 L.Ed.2d 1549 (1959). The defendants, by virtue of their attorneys' consent to the bifurcation procedure, are therefore deemed to have waived any sixth amendment right potentially implicated by the decision to bifurcate the trial.[5]

## ADEQUACY OF JOSHI'S TRANSLATION

Joshi contends that the inadequacy of the trial translation violated the Court Interpreters Act, 28 U.S.C. § 1827 (Supp. V 1981), interfered with his sixth amendment right to counsel, and resulted in the deprivation of due process as guaranteed by the fifth amendment. These arguments are meritless.

■ The Court Interpreters Act, while underscoring the importance of ensuring the highest quality translations for non-English speaking defendants, does not create new constitutional rights for defendants or expand existing constitutional safeguards. *See United States v. Tapia,* 631 F.2d 1207, 1209–10 (5th Cir.1980). Rather, the purpose of the Act is to mandate the appointment of interpreters under certain conditions and to establish statutory guidance for the use of translators in order to ensure that the quality of the translation does not fall below a constitutionally permissible threshold. H.R.Rep. No. 1687, 95th Cong., 2d Sess. at 2–4 (1978) [hereinafter House Report], *reprinted in,* 1978 U.S.Code Cong. & Admin.News 4652, 4652–54. The basic constitutional inquiry remains unchanged: whether any inade-

quacy in the interpretation "made the trial fundamentally unfair." *Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir.1989) (Powell, J.); *Tapia,* 631 F.2d at 1210.

■ Joshi is correct that the general standard for the adequate translation of trial proceedings requires continuous word for word translation of everything relating to the trial a defendant conversant in English would be privy to hear. *See United States v. Lim,* 794 F.2d 469, 470 (9th Cir.), *cert. denied,* 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986); *Tapia,* 631 F.2d at 1209; *United States v. Diaz Berrios,* 441 F.2d 1125, 1127 (2d Cir.1971); House Report, *supra,* at 7–8, *reprinted in,* 1978 U.S.Code Cong. & Admin.News 4652, 4658–59. Defendant errs, however, in assuming that occasional lapses from this standard, particularly when they are not objected to by the defendant, will render a trial fundamentally unfair.[6] Although a continuous word for word translation of the proceedings will always pass constitutional muster, minor deviations from this standard will not necessarily contravene a defendant's constitutional rights.

Defendant also errs in implying that the trial court must compel the defendant to pay attention to the trial testimony in order to ensure a fair trial. Non–English speaking defendants as with English speaking defendants may listen to or ignore trial testimony as they wish. *Cf. United States v. Desist,* 384 F.2d 889, 902 (2d Cir.1967) (no error where defendant rejected available interpreter), *aff'd,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969). While a

---

**5.** Defendants' contention that their exclusion from the summations in Joshi's segment of the trial violated their sixth amendment right to be present at all critical stages of the trial when their absence might frustrate the fairness of the proceedings is meritless. *See Faretta,* 422 U.S. at 819 n. 15, 95 S.Ct. at 2533 n. 15; *Stratton,* 649 F.2d at 1081. By consenting to the bifurcated procedure, the defendants also waived whatever rights they had to be present during the summations in Joshi's portion of the trial. Additionally, none of the defendants objected to their exclusion from the summations. In any event, *Stratton* is inapposite because here the defendants' attorneys were permitted to sit in during the summations and the absence of the defen-

dants did not undermine the fairness of the proceedings.

**6.** The legislative history of the Court Interpreters Act contemplates that under certain circumstances even "summary translations" allowing the interpreter to "condense and distill the speech of the speaker" would be permissible. House Report, *supra,* at 8, *reprinted in,* 1978 U.S.Code Cong. & Admin.News at 4659; *see also Valladares,* 871 F.2d at 1565–66 (affirming conviction where defendant received summaries of testimony rather than word for word translations).

defendant entitled to the use of a translator must waive that right knowingly and voluntarily, no such formal waiver requirement is mandated, or indeed feasible, when the defendant simply decides not to listen to the translator. *See Lim,* 794 F.2d at 471–72 (waiver provisions of Court Interpreters Act inapplicable when interpreter has been appointed); *see also Valladares,* 871 F.2d at 1566 (suggesting that act is only applicable to issues concerning appointment of translator rather than adequacy of translation).

■ The trial record reveals a scrupulous effort by the court and prosecutor to insure that Joshi was receiving adequate translation. Joshi received a court appointed translator who sat beside him throughout the course of the trial. The court emphasized to the translator the importance of providing a continuous word for word translation of the proceedings and periodically inquired whether such interpretation was being provided. The only suggestions in the transcript that Joshi may not have been receiving adequate interpretation came as the result of inquiries from the court and government rather than Joshi and his counsel.

The record does not indicate a single objection by Joshi or his counsel relating to the adequacy of translation. Moreover, in order to alleviate the court and prosecutor's concerns about the adequacy of translation, Joshi's attorney instructed his client to raise his hand any time the interpreter ceased translating. The transcript does not reveal any instance where Joshi subsequently objected to the translation in this or any other manner. Additionally, at the prosecutor's insistence, Joshi's counsel agreed to ask his client whether he felt that the translation he had received up until that point was adequate. Once again, the record does not indicate an objection resulting from information disclosed in such a conference with his client.

A reviewing court is unlikely to find that a defendant received a fundamentally unfair trial due to an inadequate translation

in the absence of contemporaneous objections to the quality of the interpretation. *Valladares,* 871 F.2d at 1566 & n. 5; *see United States v. Bennett,* 848 F.2d 1134, 1141 (11th Cir.1988); *Lim,* 794 F.2d at 471; *Tapia,* 631 F.2d at 1207; *United States v. Martinez,* 616 F.2d 185, 187–88 (5th Cir. 1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). As retired Justice Powell noted in *Valladares,*

> Only if the defendant makes any difficulty with the interpreter known to the court can the judge take corrective measures. To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse.

871 F.2d at 1566.

The most potentially damaging incident relating to the adequacy of the translation was revealed when the prosecutor discovered that the interpreter had not translated to Joshi nearly two and one half hours of video tape evidence that had been introduced against his coconspirators. Joshi's interpreter explained, however, that he had not translated the tapes because Joshi "was not involved in that part of the business and he said he didn't want to listen to it."[7] Even if Joshi had not instructed his interpreter to cease translating, any error resulting from this omission was cured by the government's offer to provide the video recordings to Joshi so he could review them if he wished during a trial break. Based on the efforts taken by the trial judge and government to ensure that Joshi received adequate translation and the absence of any objections from the defendant with respect to the quality of the translation he received, we cannot say that the nature of the translation deprived Joshi of a fundamentally fair trial.

■ We likewise reject Joshi's claim that the nature of the translation inhibited his ability to communicate with his attorney and thereby undermined his sixth amendment right to counsel. The only incident

---

**7.** This explanation is consistent with a subsequent incident in the record where Joshi in-

structed the interpreter not to translate another tape because "he wasn't interested."

potentially implicating Joshi's sixth amendment rights occurred when a new translator began interpreting from the back of the court room via a radio headset and counsel for Joshi expressed concern that the unavailability of the translator at the defense table would preclude him from effectively communicating with his client. The court immediately appointed a second translator to effectuate communications between Joshi and his attorney, while the first translator continued to interpret the trial proceedings.[8] Joshi's counsel did not object to this procedure nor did he at any other time during trial raise a concern about his ability to communicate with his client. *See Lim*, 794 F.2d at 471 (noting absence of objections to translation in rejecting contention that inadequate translation interfered with defendant's sixth amendment rights). Because there is no indication that Joshi was inhibited from communicating with his attorney in such a way as to compromise his right to effective assistance of counsel we reject Joshi's sixth amendment claims. *See Bennett*, 848 F.2d at 1140–41; *Tapia*, 631 F.2d at 1210; *Desist*, 384 F.2d at 902.

## USE OF JOSHI'S NOD AS AN ADOPTIVE ADMISSION

Joshi asserts that the trial court committed reversible error in admitting evidence that he nodded in response to a statement by Jitendra Panchal implicating him in the narcotics conspiracy.[9] Joshi claims that the trial court erred in admitting the statement as an adoptive admission under Fed. R.Evid. 801(d)(2)(B) because it did not make a sufficient inquiry to establish whether Joshi understood the statement. We will not disturb a trial court's evidentiary rulings unless the court has clearly abused its broad discretion in such matters. *United States v. Champion*, 813 F.2d 1154, 1172 (11th Cir.1987); *United States v. Martin*, 794 F.2d 1531, 1532 (11th Cir.1986); *United States v. Rosenthal*, 793 F.2d 1214, 1241 (11th Cir.), *modified in part*, 801 F.2d 378 (1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).

When a statement is offered as an adoptive admission two criteria must be met. First, the statement must be such that an innocent defendant would normally be induced to respond. *United States v. Jenkins*, 779 F.2d 606, 612 (11th Cir.1986); *United States v. Carter*, 760 F.2d 1568, 1579 (11th Cir.1985). Second, there must be sufficient foundational facts from which the jury could infer that the defendant "heard, understood, and acquiesced in the statement." *Jenkins*, 779 F.2d at 612; *Carter*, 760 F.2d at 1579. The first criterion, which is of particular relevance in cases involving silent acquiescence, is not at issue here because the defendant is alleged to have responded to Panchal's statement

---

**8.** Even if the district court had not acted prudently by appointing a second translator, Joshi's sixth amendment rights would not have been violated if the court had permitted brief recesses to allow client-attorney communications when requested. *See Bennett*, 848 F.2d at 1141.

**9.** Special agent Lopez testified as follows:

Ms. Wilkinson [prosecutor]: Can you tell us what happened at that meeting?

Lopez: At that meeting we met Jitendra and he and Mr. Joshi got into the undercover vehicle with us and introductions were made and we had a conversation. ....

Wilkinson: Did Jitendra tell you what Mr. Joshi's role was?

Lopez: Yes, he did.

Wilkinson: What did he say?

Mr. Galanter [Joshi's counsel]: Excuse me, I have an objection as previously made before the court.

The Court: The objection is overruled.

Lopez: He indicated that Mr. Joshi was a long—a partner for many years and Mr. Joshi was also a partner in the shipment that had been seized in Newark and that Mr. Joshi would also be an associate and a partner in the future load.

Wilkinson: Was Mr. Joshi present during the conversation?

Lopez: Yes, he was.

Wilkinson: What did he do in response?

Lopez: Mr. Joshi nodded, but to the best of my recollection I do recall that Mr. Joshi spoke in English, but I don't even remember exactly what he said. I don't recall.

Wilkinson: So you had no trouble communicating with either Mr. Panchal or Mr. Joshi at that meeting?

Lopez: No. None whatsoever.

by nodding affirmatively.[10] Our analysis will therefore focus on the second requirement.

 Generally, before admitting a statement as an adoptive admission, the trial court must determine whether a jury could reasonably find that the defendant comprehended and acquiesced in the statement. *Jenkins,* 779 F.2d at 612; *Carter,* 760 F.2d at 1579–80. Here, instead of making such a preliminary finding, the trial court admitted the testimony stating "[t]hat is a factual issue and we will hear evidence on that as we go through the trial, and if there is insufficient evidence, the relief is Rule 29." This approach is improper because it needlessly risks the possibility of reversal if the evidence is subsequently found to have been erroneously admitted. By requiring the prosecution first to provide some evidence of the two foundational prerequisites to the introduction of adoptive admissions, the likelihood of erroneously admitting the evidence is significantly diminished.

Although this case presents a close question, we find sufficient evidence in the record that Joshi comprehended and adopted the statements made by Jitendra Panchal to find that their admission against Joshi was not an abuse of discretion. Both agents provided testimony that Joshi exhibited an understanding of English during the car meeting and when he assisted them in unloading and identifying the barrels of hashish in the warehouse. Additionally, there was evidence that Joshi had resided in Great Britain. Finally, the nod itself could support an inference that Joshi understood the statements to which he was responding. Counsel for the defense vigorously attacked all of these evidentiary inferences during cross-examination and in summation. Nevertheless, because there was sufficient evidence for a reasonable juror to have construed Joshi's nod as a knowing acknowledgement of Panchal's statement, the introduction of the evidence as an adoptive admission was not a clear abuse of discretion. *See Jenkins,* 779 F.2d at 613 n. 4 (ultimate determination of foundational prerequisites for adoptive admissions is for jury).[11]

## CONCLUSION

Joshi raises several additional claims relating to the trial court's failure to provide

---

10. Special agent Harper's recollection of the meeting was consistent with and elaborated upon the testimony given by special agent Lopez.

> Ms. Wilkinson: What did Mr. Joshi do, if anything?
> Mr. Harper: .... When the introductions were made by Jitendra Panchal, that Joshi was a partner, Mr. Joshi just basically said hello. He shook our hands and nodded his head affirmatively, that he had been a partner and—I took that to mean that he had been a partner in the load of Newark and also in the upcoming load.

On redirect, agent Harper further described the incident:

> Ms. Wilkinson: Was there any sound made when Mr. Joshi nodded his head?
> Mr. Harper: I believe he made—he did make an uh-hum sound.... I observed him nod his head. He didn't nod his head the entire time he was in the car. He only nodded his head after exchanging greetings with us, he nodded his head in response to Jitendra Panchal's statement that he was a partner of theirs and had been a partner in the load in Newark and in the upcoming load.... When Mr. Panchal introduced him to us and then informed us that he was a partner, I looked in the rear-view mirror directly at Mr.

Joshi, and he nodded his head to me in the mirror.

11. Alternatively, Panchal's statements could have been admitted as coconspirator statements under Fed.R.Evid. 801(d)(2)(E). The court ruled that there was substantial independent evidence showing the existence of a conspiracy to support the admission of coconspirator statements against Joshi. *See Carter,* 760 F.2d at 1580; *United States v. James,* 590 F.2d 575, 581 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). This finding is supported by the record. Joshi's contention that the statements are inadmissible as coconspirator statements because the conspiracy had already terminated is meritless. There was ample evidence, including the statements themselves, of an ongoing conspiracy involving both the Miami and Newark hashish importation plans. *See Bourjaily v. United States,* 483 U.S. 171, 175–79, 107 S.Ct. 2775, 2779–80, 97 L.Ed.2d 144 (1987); *United States v. Chestang,* 849 F.2d 528, 531 (11th Cir.1988). Therefore, even if the testimony had been erroneously admitted as an adoptive admission, any error resulting from the admission would have been mitigated because Panchal's statements would also have been admissible against Joshi as coconspirator statements.

certain instructions to the jury.[12] These contentions are meritless. None of the defendants requested these instructions at trial nor did they object to their omission. Therefore, these claims will not be reviewed by this court unless they constitute plain error. *United States v. Martinez,* 763 F.2d 1297, 1304 (11th Cir.1985); *United States v. Fuentes–Coba,* 738 F.2d 1191, 1196 (11th Cir.), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). None approaches this strict standard of review.

Because none of the claims raised by the defendants provide an adequate basis for relief, the judgment of the district court is AFFIRMED.

---

**12.** The defendants now claim that the court, *sua sponte,* should have provided the jury with special instructions relating to adoptive admissions, trial bifurcation, and multiple defendants.