**UNITED STATES of America, Plaintiff,**

v.

**Rafael A. URENA, Lourdes Collington, and Gwendolyn Davis, Defendants.**

Crim. A. Nos. 93–10011–01 to 93–10011–03.

United States District Court,
D. Kansas.

Aug. 20, 1993.

---

Kim Fowler, Asst. U.S. Atty., Wichita, KS, for plaintiff.

Kenneth L. Weltz, Wichita, KS, for defendants.

### *MEMORANDUM AND ORDER*

BELOT, District Judge.

This matter comes before the court on Urena's motion for judgment of acquittal, or in the alternative a new trial, pursuant to Fed.R.Crim.P. 29(c) and 33. (Doc. 68) Urena was convicted after a jury trial of conspiring to distribute cocaine, possession of cocaine with intent to distribute cocaine, and

travel in interstate commerce with intent to commit an unlawful activity in violation of 21 U.S.C. § 841(a), 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 1952(a)(3).

Urena makes three arguments in support of his motion. First, he challenges the sufficiency of the evidence supporting the conviction. Second, he contends the court erred in admitting hearsay statements of his co-conspirators, Lourdes Collington and Raymond, into evidence. Third, he contends the court-appointed interpreter was not competent to serve in the trial.

In ruling on a motion for acquittal made at the close of all the evidence,[1] the court must consider all direct and circumstantial evidence that was presented in this case and the inferences that may reasonably be drawn from that evidence in the light most favorable to the government. *United States v. Young,* 954 F.2d 614, 616 (10th Cir.1992). In its case-in-chief, the government presented the testimony of Gwendolyn Davis, who identified Urena as a member of the conspiracy to distribute cocaine. Davis testified that she was introduced to Urena by Lourdes Collington, a co-conspirator, in January, 1993, in New York City. She discussed with Collington and Urena the possibility of selling cocaine in Wichita. After picking up cocaine at Urena's apartment, Davis travelled to Wichita. Urena came to Wichita shortly thereafter and moved into a residence at 823 South Belmont. Davis testified that she and Urena went to the residence of Wilbert Shaw on two separate occasions, where Urena delivered cocaine in exchange for money.

Detective Johnny Greene of the Wichita police department also testified in the government's case-in-chief. He executed a search warrant at the residence at 823 South Belmont, which turned up crack cocaine, large amounts of cash, and other drug paraphernalia such as scales. The detective also seized some phone bills that listed phone calls to the New York number given by Urena to the detective. One call was made approximately two weeks prior to Davis' trip to New York.

Urena, in his case, testified in substance that he did not commit the acts charged. Some of his testimony is detailed, *infra,* and will not be summarized here. He also offered what amounted to character testimony.

Urena argues, as he did at trial, that Davis is an unreliable witness because she is a convicted felon, a prostitute who runs an escort service, and also received favorable treatment from the government in return for her testimony in this case. If the court were to accept Urena's argument, it would seriously undermine the government's efforts to apprehend and prosecute narcotics crimes. It is not uncommon for the government to utilize the services of confidential informants to ferret out criminal activity. In fact, without objection by Urena, the court expressly instructed the jury that it was permissible for the government to employ undercover strategies involving artifice and trickery to gain the confidence of a narcotics suspect. (Jury Instruction No. 38) It is common knowledge that confidential informants used by the government in narcotics cases often have less than pristine reputations. This fact does not necessarily render them unreliable witnesses. The court recognized the dangers inherent in Davis' testimony and instructed the jury that the testimony of a witness who testifies against a defendant for immunity from punishment, or for personal advantage or vindication, must be weighed with greater care than the testimony of an ordinary witness. (Jury Instruction No. 35) Urena had a full opportunity to cross-examine Davis and cast doubt on her motive and credibility.

In the court's view, there was more than sufficient evidence from which a reasonable juror could reach the conclusion that Urena committed the offenses of which he stands

---

1. Urena's motion suggests that the court erred in failing to sustain his motion for acquittal made at the end of the government's case. Urena cannot seek review of that ruling. If the motion is not reviewed at the end of the close of all the evidence, any objection to the court's ruling is deemed withdrawn. *United States v. Walker,* 915 F.2d 1463, 1466 (10th Cir.1990). When, as here, the motion is renewed at the end of all the evidence, the motion made at the conclusion of the government's case is deemed waived and the sufficiency of the evidence is determined by examination of the entire record. *United States v. Boss,* 671 F.2d 396, 401 (10th Cir.1982).

convicted. The motion for judgment of acquittal is denied.

Urena alternatively seeks a new trial. The court may grant a motion for new trial "if required in the interest of justice." Fed. R.Crim.P. 33. "A motion for new trial 'is not regarded with favor and is granted only with great caution, being addressed to the sound discretion of the trial court.'" *United States v. Page,* 828 F.2d 1476, 1478 (10th Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987) (quoting *United States v. Allen,* 554 F.2d 398, 403 (10th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977)).

■ Urena argues the court erred in admitting hearsay into evidence when it allowed Davis to testify about statements made by Lourdes Collington and Raymond to corroborate the defendant's agreement to distribute cocaine. Urena contends the foundational requirements of Fed.R.Evid. 801(d)(2)(E) were not satisfied.

■ Co-conspirator's statements that are admissible under Rule 801(d)(2)(E) are not hearsay. In order for such statements to be admissible, there must be evidence of a conspiracy involving the declarant and the defendant against whom the declaration is offered, and that the statement was made in the course of and in furtherance of the conspiracy. *United States v. Caro,* 965 F.2d 1548, 1557 (10th Cir.1992).[2] In determining whether these requirements are met, the court is not restricted to considering only evidence independent of the co-conspirator's testimony, but can also consider the hearsay statements sought to be admitted. *United States v. Johnson,* 911 F.2d 1394, 1403 (10th Cir.1990), *cert. denied* 498 U.S. 1050, 111 S.Ct. 761, 112 L.Ed.2d 781 (1991). The preliminary facts necessary for the admission of co-conspirator hearsay (existence of a conspiracy involving the declarant and that the statement was made during the course and in furtherance of the conspiracy) must be proved by a preponderance of the evidence.

*United States v. Perez,* 989 F.2d 1574, 1577 (10th Cir.1993) (en banc).

The testimony of Davis alone is sufficient to satisfy the requirements of Rule 801(d)(2)(E). As the Supreme Court recognized in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), "a co-conspirator's statements can themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Id.* at 180, 107 S.Ct. at 2781. Davis testified as to her own participation in the drug conspiracy. She also identified Collington and Raymond as members of the conspiracy and described their roles. She described her visit to New York in January, 1993. While in New York, she was introduced to Urena by Collington. During the trip, she had conversations with Urena, Raymond, and Collington about the conspirators' plan to distribute cocaine in Wichita, Kansas. *Cf. United States v. Cresta,* 825 F.2d 538, 550–51 (1st Cir.1987), *cert. denied* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988) (government informant testifies that co-conspirator told him that defendant was an agent for marijuana buyers and a member of the conspiracy). Davis testified that Urena was a member of the conspiracy and not an innocent bystander, as Urena claimed. At one point, she even went to Urena's New York apartment to pick up cocaine. The statements at issue related to the plan to distribute cocaine in Wichita and were clearly in furtherance of the conspiracy. *See United States v. Johnson,* 925 F.2d 1115, 1117 (8th Cir.1991).

In addition, circumstantial evidence connects Urena to the conspiracy. The Wichita residence (Davis' residence) he was living in was searched and cocaine and drug paraphernalia was discovered. Phone records documenting calls from the residence to Urena's New York apartment were also discovered. While this evidence is capable of innocent interpretation, it is also consistent with Urena's involvement in the conspiracy.

2. Urena suggests his Sixth Amendment right to confront his accusers was violated by the admission of Collington's and Raymond's statements. (Doc. 69, p. 11) The court notes that the requirements for the admission of statements pursuant to Rule 801(d)(2)(E) are coterminous with the constitutional requirements of the confrontation clause. *U.S. v. Drew,* 894 F.2d 965, 968 (8th Cir.), *cert. denied* 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990).

The court finds the admission of the co-conspirator's statements under Rule 801(d)(2)(E) was not erroneous.

Urena argues the court-appointed interpreter was incompetent and should have been replaced. In support of his contention, Urena has submitted an affidavit from his own interpreter, LuAnn Jensen, listing certain errors the court-appointed interpreter allegedly made. The government responds that while Urena made a general objection to the interpreter at the beginning of his testimony, he failed to make specific objections to inaccuracies in the translation at the time they arose, rendering his present objection unreviewable. *Morales–Gomez v. United States*, 371 F.2d 432, 433 (10th Cir.1967). Alternatively, the government contends that even if the court accepts as true the errors alleged in Jensen's affidavit, the errors were not material to the outcome of the trial.

As a general rule, the defendant is entitled to a word for word translation of his testimony. *United States v. Huang*, 960 F.2d 1128, 1135 (2nd Cir.1992). However, deviations from that standard do not constitute reversible error unless they render the trial fundamentally unfair. *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir.), *cert. denied* 498 U.S. 986, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990).

In the case at bar, it is impossible for the court to ascertain whether the translation was accurate by reviewing the transcript of Urena's testimony. It was incumbent upon Urena to make a contemporaneous objection[3] if his testimony was being misinterpreted. This would have given the court an opportunity at the time to resolve any dispute over the translation. Urena had the services of his own interpreter throughout the trial.[4] To grant Urena a new trial in the absence of contemporaneous objection would reward him for failing to object and invites abuse. *United States v. Paz*, 981 F.2d 199, 201 n. 2 (5th Cir.1992).

While the court cannot resolve the accuracy of the translation by reviewing the transcript, the court does observe that the transcript of Urena's testimony is consistent with the defense he presented throughout the trial and in his closing argument. Urena's defense was that he had no knowledge of any cocaine distribution conspiracy, had moved to Wichita to work as a driver for an escort service because he was unable to find work in New York, had never sold drugs in Wichita, and neither saw nor knew that cocaine was present in the residence at 823 Belmont. As will be seen, the transcript of Urena's testimony addresses each of these contentions in a clear and intelligible fashion.

The transcript of Urena's testimony reflects that he was first asked about his background. The recorded answers reveal that he was born in Santa Domingo in 1962 and moved to the United States in 1982. He had finished high school and two years of college, where he studied industrial technology and participated in sports. After moving to New York, Urena worked at several jobs, including work in a clothing factory, a company cleaning marble, a button factory, interior decorating, and a pet shop. Urena testified he lost his job in the pet store, and was unable to find work thereafter because a recession had hit New York.

Urena was then asked about his relationship with the other members of the conspira-

---

3. The need for timely, specific objection is a very practical requirement and the court sees no reason why requiring contemporaneous objection to allegedly inaccurate translation should be treated any differently than the requirement for contemporaneous objection to admission of evidence. *See United States v. Bowser*, 941 F.2d 1019, 1021 (10th Cir.1991). Here, Urena was represented by highly competent counsel, a former Assistant United States Attorney, who was no stranger to criminal cases and the rules of evidence. In addition, Urena had his own interpreter. If the court's interpreter was doing as bad a job as Urena and his interpreter now contend, there is no reason why that should not have been brought to the court's attention at the time the alleged mistranslations occurred. In any event, for the reasons hereafter stated, the court finds that Urena's story was more than adequately conveyed to the jury and that any mistranslation, assuming it occurred, did not affect any of Urena's substantial rights.

4. The record is also clear that Urena understood some English. He answered several questions without waiting for the interpreter to translate the question.

cy and why he moved to Kansas. The transcript indicates that Urena testified he had known Lourdes Collington for about seven years, and had never met either Gwendolyn Davis or a Dominican male named Raymond before coming to Wichita. When asked why he came to Kansas, Urena responded (through the interpreter):

A: Lourdes told him that she had a friend here who—had a friend who owned an escort service and could get him work here.

Urena then denied that Collington ever told him anything about selling drugs in Wichita. He also denied either using drugs or bringing any cocaine to Wichita. Urena admitted he stayed in an apartment at 823 South Belmont when he arrived in Wichita along with Collington, Davis and a man he believed was named Edward Daily. Urena was asked and responded through the interpreter:

Q: When you were in that house did you ever see any cocaine?

A: No.

Q: Did you know there was cocaine in that house?

A: No.

Q: Were there people that would come in and out of that house?

A: Yes.

Q How many people?

A: He said twice some people came and left.

Q: Did you know who those people were?

A: No.

Urena then testified he had driven Gwendolyn Davis around Wichita on one occasion in the course of what he thought was her escort business. Urena was asked:

Q: Do you remember what street it was on where you drove Gwendolyn Davis?

A: The paper that they gave him said Topeka street.

5. Merriam Guiterrez.

. . . .

Q: When you drove Gwendolyn Davis was anyone else with you besides Gwendolyn Davis?

A: No.

Urena described what happened on the one time he drove Gwendolyn Davis. He testified he waited in the car while Davis went inside the house with a black man. Urena was asked and responded through the interpreter:

Q: Did you speak with that black man?

A: No, and he didn't speak to me.

Q: Did you ever get out of your car?

A: No.

Q: Had you ever been inside that house?

A: No.

Q: Did you ever sell any drugs in Wichita?

A: No.

Q: Did you ever have any drugs in your possession in Wichita?

A: No.

Q: Were you involved in a conspiracy with Gwendolyn Davis to sell drugs in Wichita?

A: No.

On cross-examination, the prosecutor first asked Urena about his relationship to the woman [5] with whom he had lived with for over one year. Urena responded that he considered the woman to be his wife although they were not married. Next, the prosecutor inquired about Urena's professed inability to find a job in New York. She reviewed Urena's previous employment background and asked him:

Q: [Y]ou're wanting this jury to believe that you could not find a job in all of New York?

A: Si. [6]

[Interpreter: He said he couldn't find work.]

6. This is an example of an instance where Urena responded without the aid of the interpreter.

Q: Are you familiar with a newspaper in New York called the "Village Voice"?

A: No.

Q: Do you know any newspapers from New York?

A: Yes.

Q: Which ones?

A: "New York Times".

Q: Are there any others?

A: "The Daily News". He said I always read the Hispanic newspaper.

Q: Do the Hispanic newspaper have want ads in them?

A: He said yes they do but when you go and search 'em out they're always already filled.

At this point, the court interrupted and ordered the question read back so the full answer could be translated. After hearing the question and answer read back, Urena responded:

A: He's talking about employment agencies that you can pay. He said you can pay a fee to an employment agency and then they'll look for work for you.

Q: Did you do that?

A: Okay. He had a friend that tried it and didn't get work that way and so he never tried it himself.

The prosecutor proceed to inquire:

Q: So you're telling this jury that you drove halfway across the country to take a job as a driver; is that correct?

A: Yes, he was trying to get something better for himself.

Q: How much were you going to get paid?

A: Lourdes (Collington) hadn't told him yet.

Q: So you came all the way to Kansas and you didn't even know how much money you were going to be making?

A: Si.

The prosecutor and defense counsel thereafter argued over whether Urena could ex-

plain his answer. Ultimately Urena finished his answer by stating:

A: Okay. He was going to do this for a while but Lourdes (Collington) was going to get him another job that would pay him $500—she was going to get him another job driving a limousine where they pay him $400 to $500 a week.

The prosecutor then returned to Urena's professed inability to find a job as a driver in New York. She asked:

Q: Had you looked for work in New York as a driver?

A: Yes, but not a lot.

Q: Do you know whether there were want ads in the paper for drivers?

A: No.

Q: There were none?

A: He didn't look at the newspaper for this.

Q: Well how would you find a job as a driver if you don't look in the want ads?

A: He has a lot of friends that own restaurants, businesses, and he would go around and ask them—I've never read the newspaper a lot, never looked a lot at the newspaper.

The prosecutor then asked Urena about how many times he had driven Gwendolyn Davis to the Topeka address. Urena insisted he went once. The prosecutor pressed Urena to testify the police officers were lying when they testified they had seen Urena at the address on two separate occasions. Urena stood by his answer and stated:

A: He says he's always respected the police and he doesn't want to say that they're lying. He just is saying that he only went there once.

The prosecutor concluded her cross-examination by asking Urena:

Q: Who is Ramone?

A: I don't know him. I don't know.

■ The court is sensitive to the fact that Urena is not an American citizen and uses Spanish as his primary language. All litigants before this court are entitled to fair

and equal treatment regardless of their race, nationality, or linguistic background. The court is left with the firm conviction after hearing the evidence and reviewing the transcript of Urena's testimony that the court-appointed interpreter was entirely competent and more than adequately conveyed the substance of the testimony to the jury. The court agrees with the government that whatever errors or omissions that may have occurred during the translation were insignificant and did not alter the fairness or outcome of the trial.

Accordingly, Urena's motion (Doc. 68) for a new trial is denied.

IT IS SO ORDERED.