**UNITED STATES of America,**

v.

**Margarita HERNANDEZ, Defendant.**

No. CRIM.A. 97–395–2.

United States District Court,
E.D. Pennsylvania.

March 9, 1998.

## ORDER

KATZ, District Judge.

**AND NOW,** this 9th day of March, 1998, upon consideration of defendant's Motion for a New Trial Due to Improper Translation/Interpretation, and the government's response thereto, and after a hearing, it is hereby

**ORDERED** that the said motion is **DE-NIED.**

### MEMORANDUM

On November 14, 1997, a jury convicted Hernandez of conspiracy to distribute cocaine, conspiracy to possess cocaine with intent to distribute, and possession of cocaine with intent to distribute. The conviction was based upon defendant's possession of more than a kilogram of cocaine in her purse during a prearranged drug delivery to a cooperating witness, as well as testimony that the defendant had previously made cocaine deliveries under similar circumstances with her co-defendant, Mateo Jose Vasquez. Defendant Hernandez required an interpreter throughout the proceedings, as she had an insufficient understanding of English. She also called two Spanish-speaking witnesses at her trial: her husband, Francisco Hernandez, and her co-defendant Vasquez. Interpreter Sagrario Aleman interpreted the testimony of the defendant's husband, and interpreter Michele Mattei interpreted the testimony of Vasquez. Hernandez testified that his wife was not a drug dealer, and that she was with Vasquez on the day of her arrest because her car had broken down and she needed to do some errands. Vasquez testified that he had put the kilogram of cocaine in her purse, and that she did not know the drugs were in the purse until Vasquez told her so immediately before the police stop. Vasquez also stated that although Margarita Hernandez had accompanied him on previous trips to deliver drugs to the cooperating witness, she did not know that he was delivering drugs at those times and did not participate in those deliveries.

At the conclusion of Vasquez's testimony, interpreter Aleman advised defense counsel that interpreter Mattei had incorrectly interpreted the word "ever" as "never" when Vasquez was asked whether he had ever gone to New York with Margarita Hernandez. *See* Tr. at 132–33. Defense counsel advised the Assistant United States Attorney of that concern. An off-record discussion ensued. Defense counsel, the AUSA, and interpreter Mattei then talked to Vasquez to clarify the question and Vasquez's response. This discussion confirmed the accuracy of the witness's prior response—that he had gone to New York with Hernandez to purchase clothes—and no correction was made on the record. At no time did defense counsel object to the use of interpreter Mattei or to any particular translation or interpretive technique utilized by Mattei.

Hernandez was scheduled for sentencing on February 26, 1998. On February 23, 1998, interpreter Aleman informed defense counsel of a number of perceived translation errors made by Mattei. Defense counsel then filed a motion for a new trial on the basis of improper translation. Aleman has since offered the following examples of problematic translations by interpreter Mattei, based on notes she took during the trial:

Aleman raised some specific objections to Mattei's translation of Vasquez's testimony.

1. In the question "Have you ever been to New York," Ms. Mattei interpreted "ever" as "never." This is the situation in which a colloquy during trial confirmed the accuracy of the witness's of-record response—that he gone to New York with Margarita Hernandez to purchase clothes.

2. When defense counsel asked Vasquez, "Were you given an opportunity to help yourself," Mattei's interpretation of the question to the witness was whether the witness had been given an opportunity to help someone else. In fact, the transcript shows that any confusion was clarified through a series of questions and responses:

Q: Did you have an opportunity to do something that would help you in this case?

A: I don't understand help myself, or help someone else, or me myself, my person?

Q: Did you have an opportunity to do something that would get you less time in jail if you did it?

A: I had an opportunity, but since I'm not going to tell lies, I didn't do it.

Q: What did you have to do to help yourself?

INTERPRETER: May the interpreter ask for clarification?

MR WYLIE: Sure.

A: It is that speaking against Margarita, I could have had a lesser sentence.

Q: Did you tell whoever told you to that you would not speak against Margarita?

A: Yes, because she has nothing to do with this.

Tr at 117–18.

3. When defense counsel asked the witness whether he had "ever" been at Israel's house, Mattei interpreted "ever" as "never." Again, the transcript shows that any confusion was clarified by he witness's response:

Q: Have you ever been to Israel's home?

A: Repeat. Repeat. I don't understand.

Q: Have you ever been to Israel's home?

A: Yes, I have been in his home.

Tr. at 120.

4. During cross-examination, when Vasquez was asked whether he had told the truth during a pretrial interview, Mattei interpreted his response, that he was "willing" to tell the truth, as he was "ready" to tell the truth. This difference occurred in the course of the following exchange:

Q: And do you remember that at the end of that meeting the investigators told you that they did not think you were being truthful?

A: Yes, it's true, they told me that.

Q: And do you remember stating in response that of every 100 words you say, 80 are true?

A: Yes, I remember.

Q: And do you remember that you were then told that 80 percent truth wasn't good enough?

A: I said I was ready to tell the truth.

Q: do you remember being told that 80 percent of the truth was not good enough.

A: (Pause) No I don't remember. That wasn't said. I was told that they wanted the whole truth, and I said the whole truth; but only the truth.

Tr. at 122–23.

As translated, the witness stated not only that he was ready to tell the truth, but that he did tell the truth. As such, the difference between "ready" and "willing" was not significant to this portion of his testimony.

5. When, under cross-examination, Vasquez said "more or less" Mattei interpreted this phrase as "approaching." The context of this exchange is as follows:

Q: Did you used to live in the same house that Margarita Hernandez lived in?

A: Yes, but it was a long time ago.

Q: How long ago?

A: It would be around maybe approaching three years ago.

Tr. at 124.

The difference between "more or less" and "approaching," in context, is not material.

6. When Vasquez was asked whether he remembered meeting with the government, Mattei used the term "I" rather than "government." It is not clear from the transcript where this exchange occurred. The transcript does not, however, reveal any confusion in Vasquez's translated responses the two times that he was asked under cross examination whether he had met with the government, and the substance of those meetings. Tr. at 122, 126. Both times, he said that he had.

7. When the AUSA said, "I am asking who put the purse between her feet," Mattei interpreted "I'm asking" as "I'm trying to find out." The context of this exchange shows that any difference is immaterial.

Q: No. I am asking about how the purse got into the car. Who put it at her feet?

A: Oh, now I understand. The purse, to get at the feet in the car, when we came out of the apartment, she stayed downstairs. I went upstairs. I put the drugs inside a Cousin's Supermarket bag, and I put it inside her purse, and all her documents I put on top of that. I went downstairs and I said, "take this." She grabbed the purse. She didn't know what was in there. I was driving. I suppose she— Well, I didn't see.—that she took her purse and she put it down there, but not knowing what was there.

Tr. at 128.

8. When the AUSA asked Vasquez whether he had obtained a false ID, Mattei interpreted "but it didn't work," as "but you

never got to use it." The transcript reveals the following:

Q: So you got a fake ID to get a car, but it didn't work?

A: No.

Tr. at 130–31.

This exchange was somewhat vague, yet it did not add or detract from the significance of the witness's immediately-preceding testimony—that he had obtained the fake ID only to get his car out of the pound and not for any other purpose. Tr. at 129–30.

9. At one point after the AUSA's questions about who put the purse containing cocaine between Hernandez's feet in the car, Mattei added an "is that correct" to a question. The transcript shows the following:

Q: And that was after it had a kilo of cocaine in it, correct?

A: Yes.

Q: And she carried the purse from the apartment to the car with the kilo of cocaine in it, correct?

A: Yes, of course she brought it, but she didn't know that was there.

Tr. at 128–29.

Even if the words "is that" were added, it did not change the meaning of the questions or the significance of the answers.

■ The particular translation errors cited by Ms. Aleman are, on the whole, immaterial, as either they were corrected in the course of the exchange between counsel and Vasquez on the record, or the errors did not affect the substance of Vasquez's testimony. The more serious allegation by Ms. Aleman is that Ms. Mattei improperly advised a witness not to speak in slang. The government asserts that the advice was not improper, as the interpreter was seeking a more accurate translation. The court disagrees. The task of an interpreter is to translate, not to give advice on elocution. Such advice might inhibit or alter the a person's ability to testify, or might affect the substance of their testimony.

According to Aleman, Ms. Mattei gave this advice to Francisco Hernandez. Ms. Aleman, on the other hand, advised Mr. Hernandez to speak the way he normally speaks, and it was Ms. Aleman who translated while Mr. Hernandez was testifying. Accordingly, it appears that any effect on Hernandez's testimony was minimal to nonexistent. If Ms. Aleman perceived any problems, it was poor professional judgment on her part not to call it to the court's attention during the trial. The court also notes that both of these interpreters leave something to be desired by way of professional conduct, and this judge will not use their services again.

■ A defendant in a federal prosecution who speaks only or primarily a language other than English is entitled to a court-appointed interpreter if her command of English impairs her ability to comprehend judicial proceedings. See 28 U.S.C. § 1827(d)(1). Implicit in this entitlement is the requirement that the interpreter be sufficiently competent to render accurate translations. See *United States v. Villegas*, 899 F.2d 1324, 1348 (2d Cir.1990). However, the Court Interpreters Act does not create new constitutional rights for criminal defendants, but rather serves to create parameters for accurate and competent translation so the quality of the translation does not fall beneath a constitutionally permissible threshold. See *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir.1990). Objections to the adequacy of translation may be waived, and the ultimate question for the court is whether the translator's performance has rendered the trial fundamentally unfair. See *United States v. Huang*, 960 F.2d 1128, 1136 (2d Cir.1992).[1] Minor deviations or occasional lapses in translation will not render a trial fundamentally unfair. See *Joshi*, 896 F.2d at 1309.

■ Defendant waived this issue, as she made no objection at trial. See *Valladares*, 871 F.2d 1564, 1565–66. Even when the court examines the substance of the allegations, however, it finds that a new trial is not warranted. The bulk of Ms. Aleman's stated

---

1. The court notes the following commentary from *Valladares v. U.S.*, 871 F.2d 1564, 1566 (11th Cir.1989):

Only if the defendant makes any difficulty with the interpreter known to the court can the judge take corrective measures. To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse.

concerns fall within the category of minor deviations or occasional lapses in translation. In such situations, any confusion created by the lapse in translation was cured by further questioning, a colloquy and agreement between counsel, or, when read in context, cannot be said to affect the substance of the witness's testimony. The totality of the prejudice to Hernandez did not render her trial fundamentally unfair. *See United States v. Urena*, 27 F.3d 1487, 1491–93 (10th Cir.1994) (despite preservation of objection, new trial was not warranted based upon conversations between interpreter and defendant after question was asked but before interpreter provided answer, as answers were coherent, exchanges were likely intended to be sure interpreter accurately conveyed defendant's meaning and defendant's testimony was consistent with defense version of events); *Huang*, 960 F.2d at 1136–37 (finding that mistrial not warranted based upon claim that interpreters summarized witness's answers where there was no evidence of any substantive inaccuracy in translation); *United States v. Gomez*, 908 F.2d 809, 811 (11th Cir.1990) (finding that mistranslation of crucial matter caused prejudice to defendant, but that evidence against defendant was overwhelming, and trial not fundamentally unfair); *cf. Negron v. State of New York*, 434 F.2d 386, 389–90 (2d Cir.1970) (providing only summaries of testimony, rather than translation, for defendant rendered trial constitutionally defective).