In this case, Evelio Sanchez appeals from his conviction on charges of rape, kidnaping, and attempted rape. After being convicted, Sanchez was sentenced to nine years on the rape charge, nine years for kidnaping, and seven years on the attempted rape, all to be served consecutively.
According to the testimony at trial, Evelio and his brother, Celso, operated a jewelry booth at the Old Fashion Days Festival in Xenia, Ohio, on Saturday, September 14, 1996. Evelio's wife, Dorinda, also worked in the business and was out of state that weekend at another festival. The alleged victim, Donna Lewis, came to the festival early that afternoon with her three young sons and stopped by the Sanchez booth several times to admire their jewelry and to talk. She and the Sanchez brothers had never met before. Late that evening, while talking to Evelio at the booth, Donna noticed that her sons were missing. Evelio helped her find the children and then bought food for the children, because Donna did not have any money.
Subsequently, Donna invited Evelio to her house and they left the festival at closing time, around 10:00 p.m. Evelio rode in Donna's car with Donna and her children, while Celso followed in the Sanchez's van. When they arrived at Donna's home, Donna's roommate, Shawn Kurrek, and another friend, Michael Shelton, were already there. At some point, another carload of men arrived at the house. Donna's house was a place where people "partied." In fact, several weeks previously the police had been called because of noise.
Shawn had already drunk a six-pack of beer before Donna arrived, and the refrigerator was empty, without even any food. As a result, Evelio offered to buy something to drink, and Donna went with him to buy beer. Evelio bought a twelve-pack of Heineken beer and also bought Donna a four-pack of strawberry daiquiri wine coolers, since Donna did not like beer. Evelio and Donna then returned to Donna's house, where Evelio, Celso, Shawn, and one of the other men who had arrived drank beer. Donna had a wine cooler.
At about 11:30 p.m., Donna asked Shawn and Michael to watch her children so she could go out. Shawn refused, but Michael agreed to watch the children. Donna then left in her own car with Evelio and Celso, and the van remained at Donna's house. Their original intent was to go to Shooters, which was a bar located about a half-hour drive from Donna's home. On the way to the bar, Evelio filled up Donna's tank with gas because he knew Donna did not have any money. At that time, Celso bought six more Heinekins and another pack of wine coolers. Celso then either said he wanted to go home or suggested that they stop at the Sanchez home, so Donna drove to Nantucket Drive, in Beavercreek, Ohio, where the house was located. When they arrived, Donna saw that the house was very nice and went in to look at the house. There is an obvious conflict about what happened inside the house. Donna's testimony was that after she was given a tour of the house, both Celso and Evelio attacked her, shoving her down the hallway into one of the bedrooms. According to Donna, Celso first raped her and then Evelio raped her. Then, the brothers raped her rectally and vaginally at the same time. Additionally, they forced her to perform oral sex and raped her or tried to rape her a second time. She also testified that she tried to leave the house and at one point was dragged back inside by the brothers after she had escaped. She eventually escaped by running through the garage and rolling under the open garage door.
Evelio's story was difficult to understand due to his language problems. However, at trial, Evelio's testimony was that after they got to the Sanchez house, he and Donna went out the garden, where Donna sat on his lap and was physically affectionate. Evelio then told Donna he was married and asked her to go inside because he didn't want his neighbors to see him with another woman. After they went inside, they put on music, danced, and watched television. Celso was in the kitchen cooking, and everyone was drinking. Donna was sitting in Evelio's lap, watching TV, but eventually switched her attention to Celso, who spoke better English and was not married.
According to Evelio, Donna willingly made love with Celso, but later also began to willingly make love with Evelio. This was after Evelio discovered the two in the master bedroom and after Celso left the bedroom to go to the bathroom. However, while they were kissing and hugging, Donna asked Evelio to stop. He did not know if it was because he did not have protection, or was because she had just been with his brother, or was because he was married. According to Evelio, he did stop when asked. After Celso returned to the bedroom with drinks, the three of them got dressed and went back downstairs to watch TV. Eventually, Evelio and Donna ended up in Evelio's own room in the basement, where Evelio once more tried to make love with Donna. Again, although she responded at first, she told him to stop, and his testimony was that he did stop when she asked.
Donna left at about 5:00 or 5:30 a.m., drove home, and called the police to report that she had been raped. At approximately the same time, Celso called the Beavercreek police to report that the van had been stolen. Thus, almost immediately after the police arrived at the Sanchez home to investigate the report about the van, they were aware of the allegation that Lewis had been raped at that address by two men. After talking briefly to Celso, who was outside when they arrived, the police gave CelsoMiranda warnings and placed him in custody in the back of a police car.
Three officers were on the scene at the Sanchez house. Originally, the officers had trouble waking Evelio, who had either passed out from drinking or had gone to sleep. Consequently, the police called the prosecutor to see about obtaining a search warrant. The prosecutor asked them to try again and to see if they could get consent to search. However, the prosecutor also said he would be available to prepare a search warrant if the police could not obtain consent. At this point, the police were able to rouse Evelio. When he came to the door, he smelled strongly of alcohol and appeared to have been drinking. He was also "foggy" and it was apparent that he had been sleeping. None of the officers had a consent form, so Detective Evers drove back to the station and got a form. Evers then brought the form back to the house and obtained Sanchez's consent to search. At no time was Sanchez advised of any constitutional rights. During the search, the officers confiscated various items, including a sports bra, socks, earrings, three sets of bedding and a blanket. During the search, Evelio told the officers that Celso had sex with the woman first, and that she wanted to have sex with Celso. Evelio also said that when he tried to have sex with her, she did not want to. Evelio stated that he "forced" her a little bit, i.e., he tried to pry her legs apart by placing his legs between them.
Immediately following the search, Evelio was placed in custody, was handcuffed, and was transported to the police station. After Evelio arrived at the police station, Detective Evers read and had Evelio sign a pre-interview form, which included Miranda warnings. At this point, which was approximately five hours after the police arrived at the Sanchez house, Evers conducted an hour-long interview with Sanchez. Subsequently, as was noted above, Evelio was charged with rape, kidnaping and attempted rape, and was found guilty of all three charges after a jury trial. On appeal, Sanchez raises the following three assignments of error:
 I. The Court of Common Pleas erred when it denied Appellant's motion to appoint an interpreter.
 II. The Court of Common Pleas erred when it denied Appellant's motion to suppress evidence and statements.
 III. The evidence was insufficient to support Appellant's conviction on the charges of rape, kidnaping and attempted rape.
After considering the assignments of error, we find that the trial court erred in denying the motion for an interpreter and the motion to suppress. As a result, we reverse the conviction and remand the case for further proceedings.
 I
In the first assignment of error, Sanchez claims the trial court erred in failing to appoint an interpreter. In this context, R.C. 2311.14(A) provides that "[w]henever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person." We have previously observed that the trial court has "broad discretion" in deciding whether a defendant needs an interpreter's help. State v. Castro (Sept. 20, 1995), Montgomery App. No. 14398, unreported, citing State v. Saah (1990), 67 Ohio App.3d 86. By the same token, we have emphasized that a defendant is "entitled to hear the proceedings in a language that he can understand." State v. Pina (1975), 49 Ohio App.2d 394. In reviewing a trial court's decision on these matters, we reverse only if the trial court abused its discretion by acting unreasonably, arbitrarily, or unconscionably. Castro, at p. 4. However, as the Ohio Supreme Court commented in AAAA Enterprises,Inc. v. River Place Community Urban Redevelopment Corp. (1990),50 Ohio St.3d 157, 161:
 It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.
 A decision is unreasonable if there is no sound reasoning process that would support that decision.
In the present case, the trial court heard testimony and reviewed a videotape and audiotape of the police interview with Evelio Sanchez on the day Sanchez was arrested. The trial court found that an interpreter was not needed because Sanchez was able to understand and to provide coherent answers. After reviewing the same materials, we disagree.
According to the evidence presented at the hearing on the motion for an interpreter, Evelio Sanchez lived in Honduras until approximately December, 1994, when he came to the United States. He married his wife, Dorinda, who speaks English, in February, 1995. Evelio's native language is Spanish, not English. Furthermore, while in Honduras, he had only approximately nine years of schooling. The alleged rape occurred on September 15, 1996, when Evelio had been in this country less than two years.
Before being arrested by the Beavercreek Police Department for rape, Evelio was arrested for DUI by the same department in December, 1995. At that time, an interpreter (Pastor Mario Garcia) was provided to Sanchez. Garcia is bilingual and is on a list of interpreters maintained by the police department. Garcia had also previously interpreted for other people in the court process. Based on his experience as well as his personal familiarity with Evelio's command of the English language, Garcia recommended that an interpreter be used. By contrast, the police officers who interviewed Sanchez stated that they had no difficulty communicating with him. The arresting officer on the DUI charge additionally testified that she felt Evelio could communicate. However, she used an interpreter as a cautionary measure, in order to prevent a later claim that Evelio did not understand something that had happened.
Normally, the discrepancy between these viewpoints would be resolved in favor of the trial court's ruling, due to the trial court's better ability to assess credibility. In this case, though, the trial court relied primarily on the videotape and audiotape, which we are able to view in the same manner as the trial court, i.e., the trial court had no greater ability to assess credibility in connection with these items than we do. After examining the videotape and audiotape, we believe the trial court was unreasonable in finding that Sanchez was able to understand and effectively communicate his answers. Specifically, the interview with Sanchez is replete with instances where the wording could not even be transcribed, and what could be transcribed is, frankly, unintelligible. For example, a typical exchange was as follows
 Detective Evers: So you ultimately ended up you were in your mother's bed with her and you were in your wife's bed with her, is that right?
 Sanchez: Is A right. But one thing you then for no reason I take her downstairs (unable to transcribe) because (unable to transcribe) I say no, not right. If I want to have sex we gonna go. But I lay down talking about when I feel a naked woman on me I say oh shit. Why should that. And then in my mind and then I say this is my bedroom but after she get dressed I won't (unable to transcribe) she already want to go. So then we went (unable to transcribe) to for her (unable to transcribe) got dressed.
Another exchange was as follows:
Detective Evers: Did she get up?
 Sanchez: No. Then my brother came back in to bring something. Whatever. And they were talking and then I (unable to transcribe) and then I was drink and I don't how about forget (unable to transcribe). And then she get up with dress on and everything and I tell her ok, uh what are we gonna do. And then I think I'm not sure I went to watch some T.V. And put some music. She like to sing and I like her voice how well she sings. And then I I I want to go no I don't want to go no I went to the (unable to transcribe) and I told her ok (unable to transcribe) because I (unable to transcribe) can be other bed but not that one. I think that was. And I told them okay can you go to the guest room or downstairs I told my brother. And he said whatever. I say okay to her can you do that please. And then she said yes, yes.
Yet another exchange was as follows:
 Detective Evers: She looked like everything she did at that point with your brother she wanted to do?
 Sanchez: She I think so because she was not like a shy because I went to her then. Because it was too (unable to transcribe) for us to like (unable to transcribe). I don't know it was a lot I was drinking.
Sanchez' problems in communication are also demonstrated by his lack of understanding about basic legal concepts that are familiar to people raised in this country. For example, the following exchange took place during the interview when Sanchez mentioned his prior DUI:
Detective Evers: Did you take that as flirting?
 Sanchez: UMMM, at some times, depend on how will look at her because if you if you can smile and look at you and then you told her something that you smiling for me is flirting. I don't know what you think about that. Okay, and then (unable to transcribe) and then they take me to home. I don't have a car but I don't drive because I don't want to. If uh I don't know uh that is the only question I have to know because I don't know if you have a DUI first then she's drinking she was drinking and driving her car. Do I get another DUI? Even if I don't drive?
Detective Evers: You would have to drive the car.
Also reflecting Sanchez' language difficulty is his lack of understanding of the potential charges at the time of the interview. First of all, when beginning the interview, Detective Evers never told Sanchez about the potential charges, or even that he was being interviewed about a rape. Instead, Evers simply said he was interviewing Sanchez about the incident that "came up the previous evening when the officers came out to [Sanchez's] house." In fact, even though Sanchez had been placed in handcuffs and transported to the station, Evers waited until after the conclusion of the interview to tell Sanchez that he was being charged with rape. Moreover, although Evers testified at the suppression hearing that he told Sanchez at the house that they were investigating a complaint about a rape or sexual assault, there is no indication that Sanchez actually understood the meaning or nature of the charge. In this regard, when testifying at trial about the interview, Sanchez said:
 A. When we finish the conversation with the detective, he say, well, you are charged with rape, and I say, what? He said, you are charged with rape. And I said, yes, because I was with another girl besides my wife? And he said, yes.
* * * *
 Q. Let me stop you there. What did you think you did wrong on the 14th and 15th of September, Evelio?
 A. Well, the wrong that I did was whatever the Detective say. He says I was charged with rape because I was with another girl besides my wife. I thought that was my charge.
Q. Do you feel that was wrong?
 A. In my mind this is not wrong. In my country this is not wrong. I know it's wrong. I know it's wrong, but it's wrong for the marriage, but — it's wrong by God, but not by the law in my country. But if you say so, I don't know the law from this country, nothing at all.
From these comments, it is apparent that Sanchez interchanged and confused the concepts of adultery and rape, i.e., he thought he was being charged criminally simply because he had sexual contact with a woman who was not his wife.
Given the poor language skills of Sanchez, which are demonstrated by his testimony in the interview and at trial, and by his lack of understanding of basic legal concepts, the trial court should have granted the defense motion for an interpreter. Sound practice would also have been to use an interpreter from the beginning of the investigation, i.e., to obtain the consent to search. Even if the police did not want to go to the trouble of using an interpreter for the consent form, they could, at a minimum, have obtained a search warrant and then could have had an interpreter available before interviewing Sanchez. While these matters will be addressed in more detail in our discussion of the ruling on the motion to suppress, we are troubled by lack of care taken to assure that a defendant charged with serious crimes not only understood those charges but had the ability to adequately protect himself.
Moreover, although Sanchez brought his own interpreter to the trial, we cannot say that the presence of the interpreter made the trial court's error non-prejudicial. In the first place, we do not know how the diversion of defense resources to this area may have impacted upon Sanchez's ability to more fully investigate and present his case. More important, the only record of the interpreter assisting is during Sanchez's own testimony. By contrast, in State v. Quinones (Oct. 14, 1982), Cuyahoga App. No. 44462, unreported, the court employed a procedure in which an interpreter used the stenographic notes of the court reporter to translate the testimony of all witnesses after each direct, cross, and rebuttal examination. As was noted in Quinones, the purpose of this procedure was to protect the defendant's constitutional rights of confrontation and cross-examination. Thus, having an interpreter available for the defendant's testimony is only one factor in determining whether a fair trial has occurred.
We also note that the general standard for translation of trial proceedings in federal court "requires continuous word for word translation of everything relating to the trial a defendant conversant in English would be privy to hear." U.S. v. Joshi
(11th Cir. 1990), 896 F.2d 1303, 1309, cert. denied, 489 U.S. 986,111 S.Ct. 523, 112 L.Ed.2d 534. In Joshi, the court indicated that while the general standard should normally be followed, minor lapses would not necessarily impinge upon a defendant's constitutional rights. The Ohio Interpreters Act does not set out specific procedures, but it seems obvious in light of federal cases that the type of procedure used in Quinones would be appropriate, particularly in situations such as the present, where serious charges are involved.
In view of the grave nature of the charges against Sanchez, we believe more should have been done by the trial court to ensure a fair trial. Accordingly, the first assignment of error is sustained.
 II
In the second assignment of error, Sanchez argues that the trial court erred in denying his motion to suppress. Before trial, Sanchez filed a motion to suppress, asking the trial court to suppress all statements made to the police and all evidence gathered from Sanchez's home. After holding a hearing, the trial court overruled the motion to suppress physical evidence, but reserved a ruling on any statements until such time as the State attempted to introduce the statements at trial. Subsequently, on the first day of trial, the court heard additional testimony about statements made by Sanchez and the circumstances surrounding the statements. The court then overruled the motion to suppress the statements and permitted the police to testify fully about statements made by Sanchez both at home and at the police station. Also, the jury was allowed to view and hear a videotape and an audiotape of the search and the interview with Sanchez.
On appeal, Sanchez makes two claims about the motion to suppress. First, he contends that his consent to the search was not voluntary. Second, Sanchez says the police violated the Fourth Amendment by failing to properly administer Miranda
warnings. Therefore, we will first consider the propriety of the search and will then discuss the Miranda issue.
 A. Propriety of the Search
In evaluating the trial court's decision, we begin with the well-established rule that "the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses. State v. Retherford (1994), 93 Ohio App.3d 586, 592, discretionary appeal overruled, 69 Ohio St.3d 1488 (citation omitted). "Our function, then, is to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." Id.
The legal standard for warrantless searches is that they are "per se unreasonable," unless a well-defined exception like voluntary consent applies. State v. Sneed (1992), 63 Ohio St.3d 3,6-7, cert. denied (1993), 507 U.S. 983, 113 S.Ct. 1577,123 L.Ed.2d 145. "Voluntariness is a question of fact and depends on the totality of the circumstances," with the government having the burden of proving that the consent was given freely and voluntarily. Retherford, 93 Ohio App. 3d at 596, quoting fromSchneckloth v. Bustamonte (1973), 412 U.S. 218, 93 S.Ct. 2041,36 L.Ed.2d 854.
In Retherford, we emphasized that "[t]he government has not met its burden when all it has proven is `mere submission to a claim of lawful authority.'" * * * If the defendant "consents" while being illegally detained, that consent is vitiated unless the government proves that it was not "the product of the illegal detention," but the "result of an independent act of free will.'"93 Ohio App.3d at 596 (citations omitted).
In finding that Sanchez's consent to the search was voluntary, the trial court relied on testimony from Detective Evers that Sanchez consented to the search, and on the court's prior finding in connection with the motion for an interpreter, i.e., that Sanchez was able to effectively understand and communicate. Given our own conclusions on the latter issue, we must disagree that the consent was voluntary.
In State v. Forrester (Feb. 6, 1998), Greene App. No. 95-CR-397, unreported, we adopted a six-factor test used in UnitedStates v. Shabazz (5th Cir. 1993), 993 F.2d 431, to assess the voluntary nature of consent. The factors to be considered are:
 "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found."
Id. at 438, quoting from United States v. Olivier-Becerril (5th Cir. 1988), 861 F.2d 424, 426. In Shabazz, the court also noted that no single factor is dispositive. Id.
After reviewing the evidence before the trial court in light of the six factor test, we find that Sanchez's consent to search was not voluntarily given. In this regard, we place primary reliance on the defendant's education and intelligence, together with his awareness of his right to refuse. As we previously noted, Sanchez' ability to communicate was hampered by his lack of command of the English language and poor understanding of the legal system in this country. Additionally, when the police officers arrived at the house, Sanchez was roused either from sleep or from having passed out due to intoxication. The testimony at trial indicated that Sanchez had consumed a significant amount of alcohol within several hours before the police got to the house. Thus, his ability to understand and communicate was further hampered by the quantity of alcohol he drank during the period before the officers arrived.
The police officers testified that when they arrived, Celso Sanchez was sitting on a car in the garage and was obviously intoxicated. Based on the information they had then, i.e., that an alleged rape had been committed by two men at the residence, the police gave Celso Miranda warnings and placed him in custody in the back of a police car. After speaking with Celso, the police knew that only two men were at the residence, and they also knew that the prosecutor was available to obtain a search warrant. When Evelio appeared at the door, he was described by the police as smelling strongly of alcohol and being foggy. In his own words, he was "drunk." Although the fact of intoxication alone might not prevent the search from being the product of "rational intellect and will," State v. Asworth (April 4, 1991), Franklin App. No. 90AP-916, unreported, it is an additional matter raising doubt under the totality of circumstances in this case as to whether Sanchez' consent was voluntary.
By way of comparison, in State v. Ruiz (Feb. 16, 1996), Montgomery App. No. 15052, unreported, a policeman fluent in Spanish explained a D.E.A. approved Miranda rights form printed in Spanish to the defendant, and then translated an English consent form into Spanish by writing Spanish on the form above the printed English words. These actions were taken before the police obtained consent to search the defendant's luggage. Under those circumstances, we found that the defendant understood and voluntarily consented to the search. Id. at p. 6. We also commented in Ruiz on the "effective work" done by the police. Id.
In the present case, no emergency or exigent circumstances required hasty action by the police. The police had already been in touch with the prosecutor and knew they could obtain a search warrant. One of the alleged perpetrators was already in custody and Sanchez could have been temporarily detained also. Further, the police had a list of translators and, in fact, had used a translator for the same individual some months before, in a case involving far less serious charges. We also note that Sanchez was not free to leave, as Detective Evers testified that officers accompanied Sanchez during the search to make sure that Sanchez did not get a weapon or go outside to free his brother or get away. Therefore, based on the totality of circumstances, we find that Sanchez's consent to search was not voluntary. As a result, the trial court erred in overruling the motion to suppress and all evidence seized as a result of the search should have been suppressed.
 B. Statements Made by the Defendant
The second suppression issue involves statements made by Sanchez before Miranda warnings were given. Prior to trial, the defense moved to suppress these statements, as well as statements made at the police station. The trial court found that Sanchez had knowingly and intelligently waived his Miranda rights with regard to the interview at the police station. However, the court deferred ruling on statements made at the house because the State did not present evidence at the hearing of any incriminating statements that would be used at trial. On the first day of trial, though, the State indicated an intent to use statements Sanchez made at the house, to the effect that Lewis did not want to have sex and that he "forced her" by attempting to place his leg between her legs. Consequently, the court resumed the suppression hearing and took testimony from Detective Evers. Following Evers' testimony, the court found that the statements Sanchez made before receiving Miranda warnings were "voluntary." Unfortunately, the court did not elaborate on the specific reasons for this decision, but instead simply incorporated its earlier ruling on the motion to suppress. In the earlier decision, however, the court had concluded only that Sanchez's consent to the search was lawfully obtained and that Sanchez had knowingly and intelligently waived his Miranda rights at the police station. Therefore, the earlier decision on the motion to suppress gives no guidance concerning the court's decision on the statements made at the house.
Sanchez argues on appeal that the trial court should have suppressed statements made at the house because he was in custody and was questioned without being given Miranda warnings. Sanchez has not, however, claimed that the trial court erred in overruling the motion to suppress statements made at the police station during the interview. Therefore, we do not consider that issue.
Regarding criminal motions such as motions to suppress, Crim. R. 12(E) indicates that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." Although findings of fact are not required, the trial court should provide reasons on the record that are "sufficiently specific to permit a reviewing court to understand the reason the trial court ruled in the manner which it did."State v. Billups (1990) 68 Ohio App.3d 248, 257. On the other hand, if the defendant does not object to the lack of findings, the error is harmless if the evidence is sufficient to demonstrate the basis for the trial court's decision. Id. See also, State v.Waddy (1992), 63 Ohio St.3d 424, 443.
In view of the trial court's conclusion that Sanchez' statements were "voluntary," we presume that the court felt thatMiranda rights did not need to be given at the Sanchez home, due to case law holding that "Miranda does not affect the admissibility of `[v]olunteered statements of any kind.'" Statev. McGuire (1997), 80 Ohio St.3d 390, 401 (citation omitted). However, the present situation differs from McGuire, where the defendant repeatedly asked an officer to speak to detectives investigating a murder. Further, after being asked if he had an attorney, the defendant said no and stated that he wished to give a statement. Id. Additionally, there was no evidence in McGuire
that the police even asked any questions during the statement. Under the circumstances, the court found that the statement was "volunteered" and that Miranda did not apply.
By contrast, in the present case, Detective Evers testified that after the consent to search form was signed, Sanchez walked through the residence with the police officers to identify certain areas of the home. According to Evers, during this walk-through, Sanchez volunteered statements. Evers testified that he did not ask Sanchez any questions. However, Evers did say that the other officers asked questions. The other two officers present in the house did not testify during the suppression hearing, but did testify at trial. One of the officers was Doyle Wright, a sergeant with the Beavercreek Police Department. According to Wright, Evers questioned Sanchez during the walk-through about having had sex the previous evening. Specifically, while they were in a bedroom on the main level of the house, Evers asked Sanchez if he had sex with anyone the previous evening. Sanchez said yes, and Evers then asked if this was sex that the "other lady" wanted. In response, Sanchez said no. At that point, Evers asked Sanchez if he had forced the lady to have sex, and Sanchez said yes. Officer Kolchaney of the Beavercreek Police Department also testified that Detective Evers questioned Sanchez during the walk-through about having sex and about whether Sanchez forced Lewis to have sex. No Miranda warnings were given before this questioning took place.
The testimony of Officers Wright and Kolchaney was not before the trial court during the suppression hearing and could not have been considered by the court in determining whether Sanchez's statements were volunteered. Therefore, while we find the conflict troubling, we cannot add to the record before the trial court and use the additional evidence to decide the appeal. Statev. Ishmail (1978), 54 Ohio St.2d 402. On the other hand, Evers' testimony at the suppression hearing indicates that Sanchez was questioned. More important, Evers' testimony is confusing and does not clearly distinguish which statements were in response to questions and which were "volunteered."
In our opinion, the pertinent inquiry should have been whether Sanchez was subjected to a custodial interrogation, since the need for Miranda warnings does not arise absent a finding that the defendant is "in custody." In the context of custodial interrogations, the United States Supreme Court has said that whether a suspect is in custody is a mixed question of fact and law entitled to independent review. State v. Smith (June 3, 1997), Franklin App. No. 96AP10-1281, unreported, p. 2, citingThompson v. Keohane (1995), 516 U.S. 99, 116 S.Ct. 457,133 L.Ed.2d 383. See also, State v. Estepp (Nov. 26, 1997), Montgomery App. No. 16279, unreported. In Thompson, the Supreme Court made the following observations about the "in custody" determination:
 Two discrete inquiries are essential: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. * * * The first inquiry, all agree, is distinctly factual. * * * The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.
116 S.Ct. at 465, 133 L.Ed.2d at 394 (citation omitted). As a result, while traditional deference is given to the trial court's factual findings, particularly where witness credibility is concerned, the reviewing court also independently decides if the facts as found reveal that the defendant was "in custody" under the controlling legal standard.
In State v. Biros (1997), 78 Ohio St.3d 426, cert. denied, (1998), ___ U.S. ___, 118 S.Ct. 574, 139 L.Ed.2d 413, the Ohio Supreme Court reiterated the controlling legal standard for deciding the custody issue:
 The determination whether a custodial interrogation has occurred requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation." * * * "[T]he ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."
Id. at 440 (citations omitted). Further, neither an officer's subjective intent nor the defendant's subjective belief is pertinent to this analysis. State v. Hopfer (1996), 112 Ohio App.3d 521,546, discretionary appeal not allowed, 77 Ohio St.3d 1488.
Since the trial court's decision contains no findings on the issue of custodial interrogation, we have reviewed the record to see if we can independently evaluate this matter. After this review, we find that Sanchez was in custody and that Miranda
warnings should have been given to Sanchez before any questioning took place at the house. However, in light of the confusing state of the record, we cannot determine which statements were in response to questioning and which were volunteered. Therefore, the case must be remanded for further hearing on this point.
According to the facts elicited at the suppression hearing, the police arrived at the Sanchez home in the very early morning hours and immediately placed Celso Sanchez in custody. Effectively, the police isolated the brothers from each other by putting Celso in a police cruiser. Besides Detective Evers, two uniformed and armed officers were present at the scene. Further, while Evers was not in uniform, he did carry a gun. After the police arrived, Evelio was never told that he did not have to talk to the police, nor was he told that the police would leave if he requested. During the time that the search was conducted, Sanchez was permitted to move about the inside of the house, but one of the uniformed officers accompanied him at all times. Although Evers characterized this as precautionary measure for the officers' safety, he also emphasized that the officers would have accompanied Sanchez outside to make sure that Sanchez would not try to free his brother or to "get away." Therefore, it is clear that the officers would not have allowed Sanchez to leave. As an additional matter, although Sanchez was in his own home, no one else was present besides the police. Finally, Sanchez was handcuffed, placed in a cruiser, and transported to the police station as soon as the search was completed.
In comparing this case with others in which we have considered the issue of custodial interrogation, the situation appears clearly custodial. For example, in State v. Steers (May 14, 1991), Greene App. No. 89-CA-38, unreported, we found that a reasonable person would have believed he was in custody where the police came to the defendant's dormitory room with a search warrant at 8:15 a.m., to search for drugs. Although the police never told the defendant not to leave, the officer who testified at the suppression hearing stated that the police would not have allowed the defendant to leave until after the search was completed. During the search, the police asked the defendant questions that could elicit incriminating responses, including which areas of the room the defendant had control over. Based on these circumstances, we found that the defendant was in custody and that Miranda warnings should have been given. By contrast, in State v. Smith (May 10, 1996), Miami App. No. 95-CA-17, unreported, we found that no custodial interrogation occurred when officers interviewed the defendant in his hospital room. Although the defendant was hooked up to an IV, the officers told the defendant that he did not have to talk to them, and further said they would leave on his request. The interview lasted approximately 45 minutes, during which time a nurse came in to ask questions. Also during this time, the defendant's sons and attorney came into the room, but were asked by the defendant to wait outside until the interview was over.
Based on the similarity of the present case to Steers, we conclude that Sanchez was in custody and that Miranda warnings should have been given before questions were asked. However, in view of the fact that the record is confusing as to which statements may have been made in response to questions from officers and which were volunteered, we believe this matter must be remanded for further hearing. At that time, the conflicts between the testimony of Detective Evers and the other officers can also be resolved. Parenthetically, we note that if the trial court accepts the testimony of Officers Kolchaney and Wright about the questions that were asked, the statements of Sanchez must be suppressed as the result of interrogation. See, State v.Knuckles, (1992), 65 Ohio St.3d 494, 496, cert. denied (1993),508 U.S. 981, 113 S.Ct. 2986, 125 L.Ed.2d 682 (noting that interrogation includes "`any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect,'" citing Rhode Island v.Innis (1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-1690,64 L.Ed.2d 297, 308.
In view of the preceding discussion, the second assignment of error is sustained.
 III
In the third assignment of error, Sanchez claims that the trial court erred in failing to grant a Crim. R. 29 motion for acquittal. This motion was made at the close of the State's case and after the defense rested. Specifically, Sanchez argues that the evidence presented by the State was insufficient to support the charges. However, Sanchez has not contended on appeal that his conviction was against the manifest weight of the evidence.
According to the Ohio Supreme Court:
 [I]n reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." * * Additionally, * * * [the] court "may weigh evidence only to determine whether it is of sufficient probative force to support a finding of guilt." * * * Thus, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."
State v. Palmer (1997), 80 Ohio St.3d 543, 566-567. We have also noted that "in order to sustain a motion for acquittal, the evidence must be of such little probative value that `reasonable minds must have had reasonable doubts' as to the accused's guilt.State v. Hopfer (1996), 112 Ohio App.3d 521, 557 (citation omitted).
While a number of items of evidence conflict with the victim's account, we cannot find that the evidence is of so little probative value that reasonable minds must have had reasonable doubt as to Sanchez's guilt. As was noted above, Sanchez was convicted of rape, attempted rape, and kidnaping. Concerning rape, R.C. 2907.02(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Sexual conduct as defined by R.C. 2907.01 includes "vaginal intercourse between a male and female; anal intercourse, * * * and the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." Attempted rape includes engaging "in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02. And finally, the elements of kidnaping, as pertinent to the present situation, are as follows:
 No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
* * * *
 (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.
R.C. 2905.01.
At the beginning of this opinion, we related the gist of the parties' testimony about the alleged rape, and we need not repeat it in detail. During that discussion, we did not mention inconsistencies in the evidence, since we were merely attempting to summarize the conflicting stories. The defense has pointed out a number of areas in which the physical evidence either contradicts or does not support the victim's version of events, and we agree that some of the evidence raises issues as to Donna Lewis's credibility. For example, Donna testified that she was pushed down a hallway and into a bedroom, where the brothers ripped off her clothes while she fought with them. After they got her clothes off, they pushed her down on the floor and Celso got on top of her, raping her. According to Donna, Celso and Evelio then pulled her up and threw her on the bed, banging her head into the headboard. During this time, Donna was pushing, shoving, kicking, and fighting with "everything" she had. After the initial assault, Donna was able to escape, gather some of her clothing and run outside into the garden. She claimed that she collapsed there and was dragged back into the house by one of the brothers.
By contrast, the officers who testified indicated that the Sanchez home had thousands of small, fragile glass and porcelain objects and knickknacks on every flat surface in the house, including the bedrooms. None of these objects were broken or disturbed. The hallways were hard to walk through because of all the objects, and the officers had to be very careful while walking not to hit the walls or tables. Also in the hallways, a number of dresses hung on doorways and stuck out on one side. None of the dresses were disturbed and there was no evidence of a struggle in the hallways and the bedrooms. In fact, a hairbrush and mirror were undisturbed right next to where Donna's sports bra was found in the master bedroom. Additionally, Donna's earrings were found together on the floor of the bedroom. While videotaping, the officers questioned why she would have taken her earrings off, and Detective Evers stated at trial that this was not consistent with Donna's testimony that her clothes were torn off. Regarding the clothes themselves, they were not torn, nor did they have any grass stains consistent with Donna's story of having been dragged in from outside.
Further, Donna's story about the rapes themselves was inconsistent. She told the first officer (Alonzo Wilson), who interviewed her, that both of the brothers had sexual intercourse with her. She did not tell him that anyone tried to force her to perform oral sex. She also did not tell him that they tried to simultaneously have sex with her, nor did she mention anal intercourse. Officer Polston also interviewed Lewis extensively on the day of the alleged rapes. According to Polston, Lewis did not tell him that she was immediately knocked to the floor in the bedroom. She further told him that Evelio, not Celso, had sex with her first, and said the brothers wanted to take turns. At the hospital, Donna told the doctor that the brothers had taken turns having sex with her. She additionally told the doctor that the brothers each had vaginal and rectal sex with her at least one time apiece. At trial, however, Donna testified that Celso had sex with her first and that the brothers had sex with her (vaginal and rectal), simultaneously. She also said one of the brothers had forced her to have oral sex.
According to Donna, after she was dragged back inside the house, the brothers took her downstairs to another bedroom and once more stripped off all her clothes. She again fought them, but although the brothers attacked her and tried to have sex, they didn't push as hard this time. Eventually, she was able to gather some of her clothes and run upstairs. She went out the first door she came to, which led to the garage, and pushed the garage door button. In the meantime, Evelio came to the garage and pushed the button to make the door go back down. Donna then escaped by rolling under the garage door. She reported that after the rape, she had bruises all over and was bleeding rectally.
The physical examination at the hospital included the standard rape protocol, including fingernail scrapings, pubic hair samples, and urine and blood samples. Additionally, the doctor took rectal and vaginal swabs, a vaginal aspirate, and a florescence test for evidence of sperm on the skin. According to the examining doctor, there was no evidence of any injury, including abrasions and contusions to the vaginal or rectal area. No semen was splashed on the skin, nor did Donna have any grass stains on her skin that would substantiate her claim of having been dragged along a lawn. Further, she had no grass, leaves, or dirt adhering to her body. She was also not bleeding. Moreover, none of the fingernails scrapings, hair samples, or samples taken from the bedding indicated anything originated from Evelio Sanchez. According to Detective Evers, the blood tests were inconclusive, as Evelio and Donna had the same blood type. The sole physical findings were of some bruises, particularly on Donna's left arm. Although the doctor could not express a definitive opinion as to the age of the bruises, beyond saying they could be up to 48 hours old, he did state that the bruises on the upper arm were consistent with an individual being grabbed by the arm. However, he also testified that bruising can result from consensual sex.
Of further note is the fact that the police observed no marks, including cuts, bruises, scratches, or redness, anywhere on Sanchez's body. At the time he was wakened by the police, he was not wearing a shirt and had on two gold chains that he apparently had been wearing since the evening before. The police did not find any broken jewelry or chains when searching the Sanchez home. Again, all this evidence casts doubt on whether the events of the evening happened the way the victim testified.
In denying the motion for acquittal, the trial court relied on Lewis's testimony and the testimony of Detective Evers, who said that Sanchez admitted forcing Lewis to have sex. Sanchez testified at trial that his meaning of "force" was that he tried to seduce Lewis but stopped when she asked. Based on our review of the videotape interview with Detective Evers, and the fact of Sanchez's poor language skills, this is not an implausible explanation for the statements Sanchez originally gave to Detective Evers. Nonetheless, these issues are ones of credibility, which the trial judge and jury were better able to assess. Therefore, while we find the conflicts in the evidence troubling, we are unable to say that insufficient evidence existed to sustain the verdict. Accordingly, we must overrule the third assignment of error.
In light of the foregoing discussion, the first and second assignments of error are sustained and the third assignment of error is overruled. The judgment of conviction is reversed, and this case is remanded for further hearing on the suppression of statements made by Sanchez at his home. Additionally, Sanchez is to be given a new trial. In both proceedings, an interpreter is to be provided by the trial court, consistent with the discussion in this opinion.
YOUNG, P.J. and WOLFF, J., concur.
Copies mailed to:
Robert K. Hendrix
Jacquelyn J. Kuhens
Hon. M. David Reid