Vui Gui TSEN, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–9619, A–9639.

Court of Appeals of Alaska.

Feb. 8, 2008.

Dan Lowery, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

This case presents two questions. First, we must determine whether the trial judge abused his discretion when he denied the defendant's request for an interpreter to assist him in understanding the testimony and proceedings at his trial. Second, the State asks us to declare that the defendant's sentence is too lenient.

As we explain more fully in this opinion, we conclude that the trial judge could properly deny the defendant's request for an interpreter because the defendant failed to allege—and still fails to allege—that his understanding of the trial proceedings was deficient in a way that led to specific, identifiable prejudice to the conduct of the defense.

With regard to the defendant's sentence, we can not determine whether the sentence is too lenient. The sentencing judge misunderstood the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and thus failed to make findings on certain

contested facts—facts which, if resolved in the State's favor, might have shown that the sentence was overly lenient.

### The question of whether the defendant was entitled to an interpreter

Vui Gui Tsen ran an escort service/massage parlor in the Spenard area of Anchorage. After the police arrested two of Tsen's female employees for prostitution, one of the women agreed to aid the police by arranging to purchase cocaine from Tsen. Tsen sold cocaine to the woman, and he was then arrested.

Following his arrest, Tsen waived his *Miranda* rights and spoke to the police about his offense. He told the officers that he was not aware that his female employees were engaging in prostitution, but he conceded that he normally purchased about 3.5 grams of cocaine per week (depending on how many women he had working), and that he sold this cocaine to his employees and their customers so that drug dealers would not come around and disturb the neighbors.

Based on these events (including Tsen's statements), Tsen was charged with two counts of third-degree controlled substance misconduct (sale of cocaine, and possession of cocaine for sale), as well as one count of third-degree promoting prostitution.[1]

A pre-trial conference in Tsen's case was held in front of Superior Court Judge Philip R. Volland on Wednesday, November 16, 2005. At this pre-trial conference, Tsen's attorney, Assistant Public Defender John A. Bernitz, notified Judge Volland that Tsen wished to have a Vietnamese interpreter during the trial.[2] Bernitz explained:

*Defense Attorney:* Mr. Tsen, although he speaks English, he is a native Vietnamese, and he wants a Vietnamese interpreter for trial because ... the language gets more complicated and quicker at trial. ... I haven't checked into the [availability of a Vietnamese] interpreter, but typically, I think, I can get an interpreter here for next week. So we'd ask that trial not start tomorrow, but start on Monday[, November 21st].

Judge Volland replied that he could start the case the following day (that is, Thursday, November 17th). However, because of a scheduling conflict, if the case was delayed until Monday, he would have to assign it to a different judge—Superior Court Judge Larry D. Card, who had already announced his impending retirement. Bernitz stated that he did not want Tsen's case handled by Judge Card because, in the event that Tsen was convicted, there was a good possibility that the sentencing would have to be assigned to yet another judge (because of Judge Card's retirement). So, rather than have Tsen's case assigned to Judge Card, Bernitz opted to have the case start the next day (November 17th) in front of Judge Volland.

The following day, the parties appeared in court before Judge Volland to begin the trial. Just before jury selection began, Bernitz again brought up the issue of an interpreter:

*Defense Attorney:* Judge, I think we're ready to go. [T]he only issue that I can think of [is] the problem [of] an interpreter. ... I don't know if I ... can say anything, if I'm restricted by [the] attorney-client privilege. I guess I can say that Mr. Tsen is a native of Vietnam, and— actually I don't know what else I can say. I mean, I have ... information about how well he speaks English. I know that he's asked for an interpreter, and I expected to have an interpreter available for ... next week. I also know we don't have one now.

*The Court:* I guess my sense [of the matter] is to let that [decision] be your call, Mr. Bernitz. ... [J]ury selection obviously ... affects Mr. Tsen's due process rights. [And] once we get into [the presentation of] evidence, his confrontation rights are affected [too]. ...

---

1. AS 11.71.030(a)(1) and AS 11.66.130(a)(1), respectively.

2. In this opinion, we use the term "interpreter" to mean a person who translates spoken (or signed) communications from one language to another. This conforms to the usage recommended in William E. Hewitt, *Court Interpretation: Model Guides for Policy and Practice in the State Courts* (National Center for State Courts, 1995), p. 31.

...

*Defense Attorney:* I think Mr. Tsen understands the words that are being said, but I think there's a nervousness about, you know, how important this case is, and that [we are] in the courtroom, and it's pretty formal. And so he's nervous about [not] understanding the whole concepts about what's going on.

Bernitz then informed the court that a friend of Tsen's, a Mr. Kalei, was in the courtroom and was willing to assist during juror voir dire. Bernitz did not know if Kalei could speak Vietnamese, but Kalei was a trusted friend of Tsen's, and he apparently had helped to explain legal concepts to Tsen in the past. Bernitz asked Judge Volland to allow Kalei to sit at counsel table and participate in the decisions about which jurors to pre-empt. Judge Volland granted this request, and Kalei sat at the table with Bernitz and Tsen during that particular day of jury selection.

On the next day of jury selection, Bernitz informed Judge Volland that he had not been able to secure the services of an interpreter, but he was "working hard" to get one. At the same time, Bernitz warned the court that if they used an interpreter, "the testimony would go half as fast as without an interpreter".

After hearing the defense attorney's warning, Judge Volland asked the prosecutor for an estimate of how long the case would take. The prosecutor answered that, without an interpreter, Tsen's case would take approximately one week (including final arguments).

Upon hearing this estimate, Judge Volland explained that the extra time required for complete interpretation of Tsen's trial would cause a scheduling conflict with other pending trials:

*The Court:* In a perfect world, [we would] select [the jury] today, have them come back on Monday, ... and then swear them in and go ahead. [But] I need to ... get this case to the jury on Thursday in order to start Mr. Bernitz's [next case, the] homicide case [starting] the following Monday. And I am concerned about how long [Mr. Tsen's case] might take if we have an

interpreter interpreting the direct and cross-examination of every witness. ... My experience is that [interpretation of this sort] literally doubles the time it takes for [witness] examination.

A few moments later, Judge Volland announced that he would make no decision regarding Tsen's request for an interpreter at that time. Rather, he would "play it by ear, and see where we are [at the end of the day]."

Jury selection continued without an interpreter for Tsen, but also without any further request for one. Four days later, on November 25th, during a break in the proceedings, the prosecutor brought up the issue of an interpreter. In response, Judge Volland expressed his belief that Bernitz, by letting the proceedings go forward without an interpreter, had implicitly acknowledged that Tsen had a sufficient command of the English language and a sufficient understanding of the proceedings to satisfy any due process concerns:

*Prosecutor:* Regarding the issue of an interpreter: Mr. Bernitz has indicated that he's still looking for an interpreter. ... And I just want to make sure [that] there's a clear record that Mr. Bernitz has made the determination that Mr. Tsen understands English [well] enough to proceed and assist him in this case. ... [W]e keep going back and forth on whether we're going to have an interpreter ..., and I don't want to have to re-do [this] trial or [answer] an ineffective assistance claim [regarding] whether [Mr. Tsen] can understand the proceedings or not.

*The Court:* Maybe I'm wrong, [but] I understood [Mr. Bernitz's] request for an interpreter [to be based] merely [on the desire] to provide additional assistance to his client. Not [on the assertion] that Mr. Tsen didn't understand English or the nature of the proceedings—because we've been going through jury selection without one. And I assumed that you made that judgement, Mr. Bernitz.

In reply, Bernitz stated that his client still wished to have an interpreter—but, at the same time, Bernitz conceded that he could

not assert that an interpreter was needed as a constitutional matter:

> *Defense Attorney:* Judge, I know that Mr. Tsen would like a Vietnamese interpreter. ... But I will do whatever the Court tells me to do. I just want to make sure that the Court is telling me to do it.
>
> *The Court:* Well, I'm not barring the presence of an interpreter here, Mr. Bernitz. ... But I did not take your request [as meaning] that you were insisting on the need for an interpreter so that your client's due process rights were protected. [If I had believed] otherwise, we wouldn't have even proceeded with jury selection.
>
> *Defense Attorney:* Judge, ... I think that Mr. Tsen wants an interpreter. And I don't know how to proceed. I mean, ... I can't say what the Court just said [*i.e.,* that an interpreter would be needed to protect Tsen's due process rights]. [But] I think Mr. Tsen thinks that his constitutional or due process rights would be violated if he doesn't get an interpreter.

Upon hearing the defense attorney's response, Judge Volland addressed Tsen' personally:

> *The Court:* Mr. Tsen, have you been able to understand me today?
>
> *The Defendant:* Sir, I can speak English. I listen—but the meaning, it really hard for me to understand the meaning a lot. For some time is I understand what the slang meaning, but some it's just not like this. Because I worry about that sometime it—I pick up—I cannot pick up something I should have tell to my lawyer, but I don't. I let it go opportunities; I worry about that, that's all.
>
> *The Court:* Have you been able to understand what we were doing in court the last few days?
>
> *The Defendant:* I come back home, I have—asking my friends and some is I don't really understand the meaning, but—and the first day, I don't really know about that much, but I learned from the first day, second day, and then I just—it was just the same thing, and listen and always not discrimination. I say, oh, that's not good, this one no good, so I just ...
>
> *The Court:* Are you able to understand Mr. Bernitz when he talks with you?
>
> *The Defendant:* More than somebody I didn't communicate with. Mostly I understand the person, I communicate for a few day or week, then I pick up. The same as if somebody who I just talk to I don't really understand very much. It's like somebody tell joke to me, I don't really laughing and they thought I meaning, but I come back, I'm going to ask my friend and I laugh myself.
>
> *The Court:* I find with respect to Mr. Tsen's command of the English language that—and the preceding colloquy should reflect it—that Mr. Tsen clearly has command of the English language, he's clearly understood what the Court was asking of him, clearly able to express himself and his limitations. What Mr. Tsen described is what many individuals experience for whom English is the[ir] second language—and that is [a] lack of command of some of the nuances of the language. I find that, so far, Mr. Tsen has understood his attorney. He has understood our proceedings in court. Although ... an interpreter [could] certainly provide assistance to Mr. Tsen, an interpreter's presence is not required in trial to assure that Mr. Tsen's due process rights are protected.

Just after Judge Volland issued this ruling, Bernitz asked the judge if he would permit Tsen to use a telephone service interpreter throughout the trial (because, apparently, no interpreters were available in Anchorage to personally attend the trial). Judge Volland asked Bernitz why an all-day, over-the-phone interpreter was necessary, in light of his ruling. Bernitz responded, "I don't know if I have [a response] to that. I [just] think it's what Mr. Tsen wants."

After Bernitz conceded that he had nothing to add on the question of whether Tsen needed an interpreter (as opposed to wanted one), Judge Volland again ruled that word-for-word interpretation of the trial testimony was not required: "I find that that level of interpretation is not required, ... based on my findings [regarding] Mr. Tsen's ability to understand the English language and communicate [in English]."

The question of an interpreter came up once more, later in the proceedings. During the course of the trial, Tsen changed his mind several times about whether he wanted to testify. Initially, Tsen told Judge Volland that he and Bernitz had decided that it would be better for him not to testify, given his poor English skills. However, Judge Volland later declared that if Tsen wished to testify, he would allow Tsen to employ the services of a telephonic interpreter if that would make him feel more comfortable about testifying.

Despite this offer, Tsen chose not to testify; instead, the defense rested its case a few minutes after Judge Volland made his ruling. However, on the following Monday, Bernitz sought permission to re-open the defense case to allow Tsen to testify. Judge Volland granted this request, and Bernitz arranged for a telephonic interpreter—but then a jury problem required a recess of the trial for a few days. By the time the trial resumed, Tsen had again changed his mind; that is, he had decided not to testify.

The jury convicted Tsen of all three counts. At the sentencing hearing on February 14, 2006, Tsen delivered an allocution in which he expressed frustration at not having had an interpreter during the trial. Tsen declared that the lack of an interpreter made it hard for him to understand what was going on, and thus hard for him to defend himself.

Now, on appeal, Tsen argues that Judge Volland violated his right to due process of law when the judge refused to order word-for-word interpretation of the jury voir dire and the trial testimony.

*(a) Why we conclude that this issue was not preserved in the trial court, and why it therefore comes to us as a claim of plain error*

■ As described in the preceding section of this opinion, Judge Volland repeatedly asked Tsen's attorney, Mr. Bernitz, if he believed that Tsen needed an interpreter to adequately understand the proceedings and assist in his defense. Each time, Bernitz declined or refused to assert that this was the case.

We note that when Bernitz first discussed this issue with Judge Volland, Bernitz told the judge that he had "information about how well [Tsen] speaks English", but that he could not say much more on this issue because of "[Tsen's] attorney-client privilege".

During the next discussion of this issue (after jury selection had been going on for a time), Judge Volland told Bernitz that he had understood Bernitz's request for an interpreter "[to be based] merely [on the desire] to provide additional assistance to his client", and not on the assertion "that Mr. Tsen didn't understand English or the nature of the proceedings". Judge Volland added that he had not understood Bernitz "[to be] insisting on the need for an interpreter so that [Tsen's] due process rights were protected."

In response, Bernitz told Judge Volland that he "[could] not say what the Court just said"—*i.e.*, he could not assert that Tsen had so little comprehension of English that continuation of the trial without an interpreter would violate due process. Instead, Bernitz told Judge Volland, "I think [that] *Mr. Tsen thinks* that his constitutional or due process rights would be violated if he doesn't get an interpreter." (Emphasis added)

In other words, when Bernitz responded to Judge Volland's statements and questions concerning the legal basis for his request for an interpreter, Bernitz consistently failed to assert—even when prompted—that there was any due process problem.

But now, on appeal, Tsen argues that the lack of an interpreter undermined his right to due process of law. Accordingly, this issue was not preserved for appeal, and Tsen must show plain error if he is to prevail.

*(b) A brief overview of the law relating to a criminal defendant's right to the assistance of an interpreter*

The United States Supreme Court has not yet explicitly decided whether criminal defendants who lack the ability, or who have limited ability, to speak and understand the English language have a due process right to the assistance of an interpreter at their trial. The Court's only pronouncement on this subject is found in *Perovich v. United States*, 205 U.S. 86, 27 S.Ct. 456, 51 L.Ed. 722 (1907), where the Court declared that the question of whether an interpreter should be

appointed to aid a criminal defendant in giving testimony "is a matter largely resting in the discretion of the trial court." *Id.*, 205 U.S. at 91, 27 S.Ct. at 458.

But in 1970, in *Negron v. New York*, 434 F.2d 386 (2nd Cir.1970), a federal court of appeals held that a defendant who neither spoke nor understood any English was denied due process of law when the trial court failed to provide an interpreter for the defendant during the portions of his trial that were conducted in English. *Id.* at 387–88. The court explained that, without an interpreter, the defendant could neither confer with his attorney nor understand the testimony of English-speaking witnesses—thus undermining the defendant's right of confrontation by impeding the defendant's ability to aid his attorney in formulating cross-examination.

Since 1970, several other federal panels have recognized a defendant's constitutional right to the assistance of an interpreter in a criminal trial.[3]

In 1978, the United States Congress enacted the federal Court Interpreters Act, 28 U.S.C. § 1827. As just explained, the extent of a potential due process right to English language translation was not well-defined in 1978. And according to the legislative history of the Court Interpreters Act, Congress did not intend the Act to "create new constitutional rights for defendants or expand existing constitutional safeguards". *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir.1990), citing House of Representatives Report No. 1687 (95th Congress, 2nd session, 1978), pp. 2–4, U.S.Code Cong. & Admin.News 1978, pp. 4652, 4652-54. Rather, the Act was intended to head off potential constitutional problems by establishing a standard procedure for trial judges to use when evaluating the need for an interpreter, and then appointing a qualified interpreter if one is needed. *Id.*

Under subsection (d)(1) of the Act, a trial judge's duty to investigate the appointment of an interpreter arises when the judge is placed on notice that the defendant "speaks only[,] or primarily[,] a language other than ... English", so that it appears that the defendant's lack of skill in English will "inhibit [the defendant's] comprehension of the proceedings or [inhibit the defendant's] communication with counsel or the presiding judicial officer, or[, if the defendant takes the stand, inhibit the defendant's] comprehension of questions and [ability to meaningfully] present[their] testimony."

Federal courts have interpreted this Act to give trial judges broad discretion when deciding whether a defendant's English language skills are so lacking as to require word-for-word translation of the trial testimony. See, for instance, *United States v. Sandoval*, 347 F.3d 627, 632 (7th Cir.2003), where the appeals court explained, "The district court is afforded wide discretion [on this issue] because it is in the best position to evaluate the need for and the performance of interpreters." *See also United States v. Sanchez*, 928 F.2d 1450, 1455 (6th Cir.1991); *Valladares v. United States*, 871 F.2d 1564, 1566 (11th Cir.1989).

■ The trial judge is given broad discretion as a matter of necessity. The decision whether to order full non-English interpretation of the trial testimony involves a balancing of the defendant's right to due process against the public's interest in the economical administration of criminal justice.[4] As the defense attorney in the present case forthrightly told Judge Volland, and as Judge Volland confirmed from his own experience, word-for-word interpretation of a trial generally means that the trial will last twice as long.

Moreover, and perhaps more importantly, the decision whether to order word-for-word interpretation of the trial testimony necessarily hinges on many variables. Chief among these variables are (1) the extent to

3. *See United States v. Mayans*, 17 F.3d 1174, 1179–1181 (9th Cir.1994); *United States v. Yee Soon Shin*, 953 F.2d 559, 561 (9th Cir.1992); *United States v. Sanchez*, 928 F.2d 1450, 1456 (6th Cir.1991); *United States v. Bennett*, 848 F.2d 1134, 1141 (11th Cir.1988); *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir.1985); *United States v. Carrion*, 488 F.2d 12, 14–15 (1st Cir.1973).

4. *United States v. Martinez*, 616 F.2d 185, 188 (5th Cir.1980).

which the defendant can comprehend spoken English (*i.e.*, understand the English speech of other people), (2) the extent to which the defendant can express himself or herself in English, and (3) the degree to which the trial testimony will present complex or subtle issues of fact that will require the defendant's input (*i.e.*, the defendant's participation in formulating the defense case and in devising the cross-examination of adverse witnesses). *See United States v. Febus*, 218 F.3d 784, 791–92 (7th Cir.2000).

We have focused on federal case law here because the Alaska law on this subject is still undefined. There are no published Alaska appellate decisions in this area. It is true that the third paragraph of the Commentary to Alaska Evidence Rule 604 states that the "[a]ppointment of an interpreter for [an] indigent defendant is probably constitutionally required if the defendant's understanding of the proceedings against him depends upon it." However, the Commentary cites no legal authority to support this statement. We note, moreover, that the Alaska Supreme Court "has [neither] adopted [n]or approved" the Commentary to our Rules of Evidence. See the "Introduction" to the Commentary to the Alaska Rules of Evidence. In other words, the commentaries to the various evidence rules represent only the views of the Evidence Rules' main drafter, Professor Stephen A. Saltzburg, and not necessarily the views or the intentions of our supreme court.

Nevertheless, for purposes of deciding this appeal, we will assume (without deciding) that Alaska law mirrors federal law on the issue of a criminal defendant's right to the assistance of an interpreter.

As explained above, when a defendant requests an interpreter, the trial judge must make an assessment of the defendant's need for an interpreter, given the level of the defendant's English skills and the particular facts and demands of the case. Seemingly, everyone (judges, lawyers, and lay persons alike) would agree that an interpreter is needed when a defendant has no understanding of English whatsoever. But that leaves a great middle ground: defendants who concededly have some ability to understand and to speak English, but not the level of language skill that a native speaker of English would possess. For these situations, there is scant case law describing the details of the analysis or the precise standards that a trial judge is to employ in making the decision. The judge is expected to base the decision on the defendant's ability to understand English, the defendant's ability to speak English, the nature of the issues to be litigated, and the anticipated complexity or subtlety of the trial testimony. Weighing all these factors, the judge must then decide whether an interpreter is necessary if the defendant is to participate effectively in his or her defense.[5] Yet, as at least one commentator has noted, trial judges are often untrained or ill-equipped to make language proficiency assessments.[6]

It is likewise unclear what level of English proficiency is necessary to preserve a defendant's due process rights. Appellate courts have consistently found that a defendant's due process rights were violated when the defendant lacked any ability to speak or understand English and yet was denied an interpreter.[7] But as the First Circuit observed in *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir.1973), "[t]he status of the right [to an interpreter] becomes less certain [in cases] where . . . the defendant has some ability to understand and communicate, but clearly has difficulty."

---

5. *See Nur v. State*, 869 N.E.2d 472, 478–79 (Ind. App.2007) (explaining the standard that trial judges should apply when deciding whether a particular criminal defendant is to be considered "non-English speaking" for purposes of appointing an interpreter).

6. Virginia E. Hench, *What Kind of Hearing? Some Thoughts on Due Process for the Non–English–Speaking Criminal Defendant*, 24 T. Marshall Law Rev. 251, 272 (1999) ("The current standard asks judges who are not linguistically trained to evaluate a defendant's ability to communicate without an interpreter, and [thus] allows for an unconscionable inequality in the safeguarding of basic trial rights.").

7. *See, e.g., United States v. Si*, 333 F.3d 1041, 1042 (9th Cir.2003); *State v. Kounelis*, 258 N.J.Super. 420, 609 A.2d 1310, 1313 (App.Div. 1992); *In re Application of Murga*, 631 P.2d 735, 736 (Okla.1981).

In *Carrion*, the First Circuit concluded that most cases raising the issue of a defendant's purported need for an interpreter would have to be resolved by deferring to the trial judge's evaluation of this issue. The First Circuit noted the reasons for giving the trial judge wide discretion on this issue (reasons we have already explained), and the court suggested that, generally speaking, "[i]t would be a fruitless and frustrating exercise for [an] appellate court [to second-guess the trial judge by] infer[ring] language difficulty from every faltering, repetitious bit of testimony in the record." *Id.* at 15.

Moreover, the appointment of an interpreter does not guarantee that the issue of the defendant's lack of English proficiency will be laid to rest. Many of the appellate decisions involving the federal Court Interpreters Act deal with allegations that the interpreter appointed to assist the defendant did not have sufficient bilingual competency, or that the interpreter was not sufficiently disinterested in the outcome.[8]

Because this issue comes to us in Tsen's case as a claim of plain error, we need not resolve all these facets of the problem. The question confronting us is whether Judge Volland plainly abused his discretion when he declined to order word-for-word interpretation of the testimony at Tsen's trial. As we explain in the next section of this opinion, the record does not show a plain abuse of discretion.

*(c) Why we conclude that, under the facts of this case, Tsen has failed to show that Judge Volland committed plain error when he declined to order word-for-word interpretation of the testimony at Tsen's trial*

■ In the previous section, we listed the primary factors that a trial judge must presumably evaluate when deciding whether to order word-for-word interpretation of the trial proceedings to assist a defendant who has some ability to understand and to speak English, but not the level of language skill that a native speaker of English would possess. These factors are: (1) the extent to which the defendant can comprehend spoken English (*i.e.*, understand the English speech of other people), (2) the extent to which the defendant can express himself or herself in English, and (3) the degree to which the trial testimony will present complex or subtle issues of fact that will require the defendant's input (*i.e.*, the defendant's participation in formulating the defense case and in devising the cross-examination of adverse witnesses). The judge should weigh these factors and then decide whether an interpreter is necessary in order for the defendant to participate effectively in his or her defense.

■ Tsen argues that no reasonable judge could have reached the decision that Judge Volland did—*i.e.*, the decision that an interpreter was not required. Tsen's position is arguably supported by the responses that Tsen gave when Judge Volland questioned him personally about his English language abilities. We quoted that exchange earlier in our opinion, but Tsen's responses should be quoted again at this point:

> *The Court:* Mr. Tsen, have you been able to understand me today?

> *The Defendant:* Sir, I can speak English. I listen—but the meaning, it really hard for me to understand the meaning a lot. For some time is I understand what the slang meaning, but some it's just not like this. Because I worry about that sometime it—I pick up—I cannot pick up something I should have tell to my lawyer, but I don't. I let it go opportunities; I worry about that, that's all.

> *The Court:* Have you been able to understand what we were doing in court the last few days?

> *The Defendant:* I come back home, I have—asking my friends and some is I don't really understand the meaning, but—

8. *See, e.g., United States v. Benitez–Arzate,* 203 Fed.Appx. 427, 428, 2006 WL 2953388 (4th Cir. 2006); *United States v. Garcia–Perez,* 190 Fed. Appx. 461, 472 (6th Cir.2006); *United States v. Gonzales,* 179 Fed.Appx. 362, 364–65 (6th Cir. 2006); *United States v. Bailon–Santana,* 429 F.3d 1258, 1260 –1261 (9th Cir.2005); *United States v. Quiroz,* 137 Fed.Appx. 667, 672, 2005 WL 1427692 (5th Cir.2005); *United States v. Aispuro–Guadiana,* 97 Fed.Appx. 76, 76–77, 2004 WL 1154791 (8th Cir.2004); *United States v. Bell,* 367 F.3d 452, 464 (5th Cir.2004); *United States v. Sandoval,* 347 F.3d 627, 632 (7th Cir.2003).

and the first day, I don't really know about that much, but I learned from the first day, second day, and then I just—it was just the same thing, and listen and always not discrimination. I say, oh, that's not good, this one no good, so I just . . .

*The Court:* Are you able to understand Mr. Bernitz when he talks with you?

*The Defendant:* More than somebody I didn't communicate with. Mostly I understand the person, I communicate for a few day or week, then I pick up. The same as if somebody who I just talk to I don't really understand very much. It's like somebody tell joke to me, I don't really laughing and they thought I meaning, but I come back, I'm going to ask my friend and I laugh myself.

It is obvious from this excerpt that Tsen had difficulty expressing himself in grammatical English—or, as Judge Volland phrased it, Tsen had difficulty with "some of the nuances of the [English] language". Nevertheless, Judge Volland concluded that Tsen had a good understanding of the questions the judge was asking him—*i.e.*, that Tsen had a good understanding of other people's spoken English. Accordingly, Judge Volland decided that it was not necessary to order word-for-word interpretation of the entire trial—although (later in the trial) he did offer to make an interpreter available to assist Tsen if Tsen decided to testify.

As Tsen points out in his brief, criminal defendants spend most of their trial listening to what other people are saying—the witnesses, the lawyers, and the judge. And if a defendant is to participate meaningfully in their defense, it is important for them to understand what is being said.

One can easily imagine that, given Tsen's limited command of English, he might not have correctly or completely understood everything that was said in the courtroom. But the same sort of problem could easily exist for defendants whose native tongue is English.

Some witnesses have accents that are difficult to understand for someone who is not used to their regional pronunciation. Some witnesses employ slang or professional jargon that is not familiar to others outside that social or professional group. Within this category, some of the chief offenders are lawyers and judges—who often speak in legal shorthand that can be incomprehensible to a lay person.

(For example, judges and lawyers speak of "continuing" a trial or hearing when they actually mean stopping it and delaying it until a later time; similarly, they say "discovery" when they actually mean disclosure.)

In other words, it is likely that many defendants—even those whose first language is English—do not have a perfect understanding of everything that is said in their criminal trial. One can hope that a defendant will be assertive enough to seek clarification of important matters, or that their lawyer will be attentive and helpful enough to offer the needed clarification. But there is no guarantee. Thus, it is reasonable to assume that, among defendants, there will be a range in their level of comprehension—varying degrees to which they can understand the witnesses' testimony and other aspects of the proceedings. Indeed, this is inescapable.

██ The question, therefore, is not whether the defendant can understand everything perfectly, but rather whether the defendant's level of comprehension is so deficient as to make the trial fundamentally unfair.

Judge Volland concluded that Tsen's difficulties with the English language did not rise to this level. And the judge's position on this matter is supported by what Tsen's attorney said—and declined to say—during the various discussions of this issue.

Obviously, Tsen's attorney had first-hand knowledge concerning Tsen's English language proficiency. The defense attorney confirmed this when he told Judge Volland that he "[had] information about how well [Tsen] speaks English". And, based on that first-hand knowledge, the defense attorney told Judge Volland that he "[thought] Mr. Tsen understands the words that are being said".

Later, when Judge Volland specifically asked the defense attorney whether he believed that Tsen's right to due process would be defeated if no interpreter was provided;

the defense attorney responded, "I think that Mr. Tsen wants an interpreter. [But] I can't say what the Court just said." That is, the defense attorney could not assert that an interpreter was needed to protect Tsen's due process rights.

We have examined the testimony presented at Tsen's trial, and (as might be expected) the witnesses' accounts of events and conversations are full of details that Tsen conceivably might not have completely grasped. But it would be mere speculation to assume that Tsen had insurmountable difficulty understanding these witnesses. The record contains no indication that Tsen failed to comprehend any of this testimony.

Moreover, we note that the primary defense strategy in this case did not require Tsen or his attorney to actively deny or rebut most of the testimony presented by the State's witnesses.

As described toward the beginning of this opinion, Tsen ran an escort service / massage parlor. The police arrested two of Tsen's female employees for prostitution, and one of the women—Tammy Hogan—agreed to aid the police by arranging to purchase cocaine from Tsen.

After Hogan telephoned Tsen to arrange the sale, one of the police officers, Officer Leonard Torres, posing as a customer, accompanied Hogan to the trailer that Tsen used as his office. When they got to the trailer, Torres handed Hogan $50.00 in "buy" money—*i.e.,* pre-marked currency that Hogan was to use when purchasing the cocaine.

Torres testified that "Mr. Tsen opened the door, greeted us, [and] let us come into . . . the trailer. . . . I was going to light a cigarette, [but Mr. Tsen] didn't want me to light it there, [so] he told me to stand in this [other] little room, . . . that I could smoke in that room." While Torres waited, "Ms. Hogan and Mr. Tsen continued on into the back bedroom . . . . [Ms. Hogan] entered [the bedroom], the door was closed, and then, within seconds, she came back out, walked to the room [where I was waiting], and placed in my hand two pieces of crack cocaine."

Torres conceded that he did not personally observe what occurred in the bedroom while Tsen and Hogan were there together behind the closed door. Torres could see Hogan as she walked with Tsen down the hall to that room, and he could see her when she came out of the room and walked back down the hall toward where he was waiting. The only time he could not see her was when she was in the room with Tsen—and she was in that room for only approximately thirty seconds.

After Tsen was arrested, the police found the pre-marked "buy" money in his wallet. And, as we described earlier, Tsen consented to be interviewed by the police. During this post-arrest interview, Tsen admitted that he routinely purchased cocaine to make it available to his female employees and their customers, so that drug dealers would not be hanging around the neighborhood.

The only major problem that the State faced in presenting its case was the absence of its main witness, Tammy Hogan. Hogan—the only potential government witness who had first-hand knowledge of what occurred when she accompanied Tsen into the room—did not testify at Tsen's trial. Indeed, despite the best efforts of the Anchorage police, Hogan was nowhere to be found.

Tsen's attorney built his defense on Hogan's absence. Rather than controverting any of the police testimony, the defense attorney pointed out that only Hogan could say for sure what happened during the crucial thirty seconds inside the back bedroom. And the defense attorney suggested that Hogan had falsely implicated Tsen in cocaine trafficking—"set [him] up"—so that Hogan would not have to pay the price for her own crimes.

The defense attorney elicited evidence that Hogan was on probation from several previous convictions for prostitution, as well as convictions for shoplifting and trespass. He suggested that, when Hogan was again arrested for prostitution that night, she faced a significant amount of jail time and therefore would try to obtain mitigated treatment in her prostitution case by appearing to help the police.

Hogan's friend and co-employee, Cynthia Stockman, testified for the defense. Stockman declared that Hogan was already in

possession of crack cocaine before the police arrived that night. Stockman stated that she personally knew that Hogan had purchased some crack cocaine the day before, and then had purchased more cocaine on the day of her arrest.

Stockman further declared that, to her knowledge, Hogan never purchased cocaine at Tsen's trailer. On cross-examination, the prosecuting attorney confronted Stockman with Tsen's post-arrest statement (*i.e.,* Tsen's admission that he made a practice of having cocaine available for sale to his female employees and their customers). Stockman responded, "I never saw that happen, [and I] don't know anything about that."

In his summation at the close of the trial, Tsen's attorney suggested to the jurors that most of the police testimony was irrelevant—that the crucial facts of the case (the events that occurred in the back room) had not been observed by the police and were not covered by their testimony:

> *Defense Attorney:* You don't know what happened in that [back] room in [the] trailer—because you weren't there, and because the State hasn't presented any witnesses as to what happened in that room. Because the door was closed, and because there's no wire on anyone in that room. ... And [the State has] to prove to you beyond a reasonable doubt ... that Mr. Tsen exchanged money for cocaine with Hogan in that room.
>
> ...
>
> [Hogan] is desperately addicted to crack [cocaine], ... and [then] she's busted ... for prostitution ..., [and] she's terrified of ... going to jail. We know [that] she's going to jail for a long time, because she's been charged so many times before.
>
> ...
>
> She's desperate enough to set up Mr. Tsen in order to avoid going to jail.

In other words, the defense attorney adopted a litigation strategy that did not require him to completely discredit the narrative of events offered by Torres and his fellow officers. For this reason, it was not crucial for Tsen to closely follow and careful-ly analyze all the details of the officers' testimony, nor was it crucial for Tsen to actively participate in formulating the cross-examination of these officers.

As we have explained, one of the primary factors that a trial judge should weigh when deciding whether to appoint an interpreter for a criminal defendant is the degree to which the trial testimony will present complex or subtle issues of fact that will require the defendant's participation in formulating the defense case and in devising the cross-examination of adverse witnesses. Tsen's case was litigated in a manner that minimized this concern.

Even now, on appeal, Tsen does not point to any particular portion of the testimony that he failed to understand, or any specific way in which his lack of English proficiency actually prejudiced him. His argument in this appeal is based solely on general assertions that his English language skills were not good. Given the circumstances here, this type of generalized assertion is not sufficient to obtain a reversal of the jury's verdict.

As we acknowledged earlier, Tsen's colloquy with Judge Volland certainly suggests that he would have had a difficult time testifying without the aid of an interpreter. But that problem did not arise—because, even after Judge Volland offered Tsen an interpreter for this purpose, Tsen chose not to testify.

Based on the record before us, Judge Volland did not plainly abuse his discretion when he concluded that Tsen's limitations as an English speaker were not so severe as to require word-for-word interpretation of the trial proceedings. We therefore uphold Judge Volland's decision in this matter.

*The question of whether Tsen's sentence is too lenient*

■ Tsen was convicted of third-degree controlled substance misconduct based on his sale of cocaine and possession of cocaine for sale. Third-degree controlled substance misconduct is a class B felony.[9] In *State v. Eskridge,* 53 P.3d 619 (Alaska App.2002), this

---

9. AS 11.71.030(c).

Court set out sentencing guidelines for class B felony controlled substance offenses. Under the *Eskridge* guidelines, a first felony offender who "has engaged in the on-going commercial sale of smaller quantities of cocaine" should normally receive up to 2 years' imprisonment. *Id.* at 621.

At Tsen's sentencing hearing, the State asserted that Tsen was a first felony offender who had engaged in on-going commercial sales of smaller quantities of cocaine. The State relied on Tsen's statement to the police following his arrest—*i.e.*, Tsen's admission that he purchased approximately 3.5 grams of cocaine per week, so that he would have cocaine available to sell to his female employees and their clients. Based on this evidence, and based on the *Eskridge* guidelines, the State argued that Tsen should receive a sentence of 2 years' imprisonment with 1 year suspended for his drug offenses.

But Judge Volland declared that the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), prohibited him from basing his sentencing decision on any factual assertions that lay outside the jury's verdict:

> *The Court:* I can't [find] that he sold that amount [of cocaine] every week. I mean, the jury didn't hear that evidence. [And] that's not what they convicted him of. He was convicted of basically a [single] transaction. I mean, there was no evidence presented [of other sales,] other than how one might interpret his admission ....

A little later in the sentencing hearing, Judge Volland explained that his refusal to find that Tsen had engaged in on-going commercial sales of cocaine was based on his interpretation of the Sixth Amendment right to jury trial as expounded in *Blakely:*

> *The Court:* [A]lthough the State presented circumstantial evidence that might suggest Mr. Tsen was involved in other cocaine sales, I interpret the *Blakely* deci-

sion to restrict my findings for the purposes of sentenc[ing] to those facts which were determined by the jury. [And the jury's verdict establishes only] a single transaction involving a modest amount of cocaine.

For this reason, Judge Volland rejected the State's argument that Tsen's conduct qualified for a sentence of up to 2 years' imprisonment under the *Eskridge* guidelines.

After assessing Tsen's conduct and background under the *Chaney* sentencing criteria,[10] Judge Volland concluded that Tsen should receive a suspended imposition of sentence, conditioned on Tsen's successful completion of 4 years' probation, plus Tsen's serving 8 days in jail (the amount of time that Tsen had already spent in jail before he was released on bail).

On appeal, the State argues that this sentence is manifestly too lenient for two class B felonies. The State's argument would have considerable merit if the facts were as the State alleges: that is, if Tsen had indeed engaged in on-going commercial sales of small quantities of cocaine. But the State's factual assertions remain unresolved—because Judge Volland concluded that, under *Blakely*, he had no authority to resolve them.

▮ The real problem here is that Judge Volland believed that his fact-finding authority was constrained by *Blakely*. This belief was mistaken.

*Blakely* holds that a defendant has a right to demand a jury trial on any issue of fact, other than a prior conviction, that (if resolved in favor of the government) will subject the defendant to a higher potential maximum sentence. But under Alaska sentencing law at the time of Tsen's offenses (that is, in February 2005), Judge Volland had the authority to sentence Tsen to any term of imprisonment up to 4 years to serve based on the jury's verdict alone, without making any additional findings of fact.[11] And the State

---

10. That is, the sentencing goals first announced in *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970), and now codified in AS 12.55.005.

11. See former AS 12.55.125(k)(2) (pre-March 2005 version), which declared that, in the ab-

sence of aggravating factors, a first felony offender could receive a sentence of unsuspended imprisonment up to the presumptive term provided for second felony offenders convicted of the same offense; and former AS 12.55.125(d)(1) (pre-

was not seeking a sentence higher than that 4–year ceiling. Rather, the State was seeking a sentence considerably below that ceiling: 2 years' imprisonment with 1 year suspended.

 We have expressly held that *Blakely* "does not regulate or restrict a sentencing judge's traditional consideration of the many factors that potentially affect the selection of a case-appropriate sentence within the applicable statutory bounds". *Cleveland v. State*, 143 P.3d 977, 986 (Alaska App.2006). See also *Vandergriff v. State*, 125 P.3d 360, 369 (Alaska App.2005) (Mannheimer, J., concurring): "[U]nder a system of *indeterminate* sentencing—*i.e.*, a sentencing scheme in which the judge has the discretion to impose any term of imprisonment within a specified range of sentences—a sentencing judge does not violate the Sixth Amendment when the judge engages in fact-finding when choosing a sentence within the specified range".

Moreover, we have also held that the *Blakely* right to jury trial does not apply to the findings of fact that trigger or define the various sentencing "benchmark" ranges or guidelines established by Alaska appellate decisions. *See Carlson v. State*, 128 P.3d 197, 211 (Alaska App.2006) (holding that a defendant being sentenced for second-degree murder has no *Blakely* right to a jury trial on the question of whether the defendant's sentence should exceed the benchmark range of 20 to 30 years to serve that was established in *Page v. State*, 657 P.2d 850, 855 (Alaska App.1983)); *Vandergriff*, 125 P.3d at 363 (holding that when a defendant is being sentenced for two or more offenses, *Blakely* does not apply to the sentencing judge's decision under the *Neal–Mutschler* rule—that is, the sentencing judge's decision as to whether, because of the need to protect the public, the defendant's composite term of imprisonment should exceed the maximum term for the defendant's most serious offense).

For these reasons, the *Blakely* right to jury trial did not apply to the State's efforts to prove that Tsen had engaged in on-going commercial sales of small quantities of cocaine. Judge Volland should have allowed

March 2005 version), which set a presumptive term of 4 years' imprisonment for second felony

the State to litigate this assertion—and, if the judge found that the assertion was proved, the judge should have sentenced Tsen according to the guidelines set forth in *Eskridge*.

To this extent, we find error in Judge Volland's sentencing decision.

### Conclusion

The judgement of the superior court is AFFIRMED. However, we agree with the State that the sentencing proceedings were flawed because the superior court adopted an erroneous interpretation of *Blakely*.

offenders convicted of a class B felony.